**Robert WEBB, individually and as next friend for his minor Children, et al., Appellants,**

v.

**Dr. Kenneth JORNS et al., Appellees.**

**No. 17242.**

Court of Civil Appeals of Texas, Fort Worth.

Oct. 15, 1971.

Rehearing Denied Dec. 3, 1971.

John H. Holloway, Houston, for appellants.

Cantey, Hanger, Gooch, Cravens & Munn, and William B. David and Richard L. Griffith, Fort Worth, for appellees, Dr. Kenneth L. Jorns and Dr. E. D. Olcott.

Brown, Crowley, Simon & Peebles, and Richard U. Simon, Jr., Fort Worth, for appellees, Mrs. Irys Eakin and Doctors General Hospital, Inc.

## OPINION

MASSEY, Chief Justice.

Preliminary to consideration of the merits we have noticed that a circumstance is

existent giving rise to the question of whether we have jurisdiction; whether there has been a final judgment from which the appeal has been taken. See Texas Rules of Civil Procedure 301, "Judgments", wherein it is stated that except where the law provides otherwise only one final judgment shall be rendered in any cause.

### On the question of our appellate jurisdiction generally

For purposes of testing whether there was a final and appealable judgment we will state a hypothesized question and answer:

■ Question: Where A has sued B and C as joint tort feasors and upon motion of B he is by written order dismissed as defendant in October, leaving A's case against C to be tried; and upon the subsequent trial of A's case against C in the following December the court withdraws the same from the jury and renders judgment for C that A "take nothing" by his suit against C; but by the signed judgment no mention is made of B or the dismissal in October of A's case against B,—is there a final judgment based upon the trial in December of which the appellate court has jurisdiction on appeal?

Answer: Yes. The dismissal of B by the order in October was brought forward and made final by implication when the "take nothing" judgment was rendered for C.

In arriving at this conclusion we are contradicting the holdings in many cases, including the following: Schell v. Centex Materials Company, 450 S.W.2d 673 (Austin, Tex.Civ.App., 1970, no writ hist.); Thomas v. Shult, 436 S.W.2d 194 (Houston (1st), Tex.Civ.App., 1968, no writ hist.); Everett v. Humble Employees West Texas Federal Credit Union, 377 S.W.2d 232 (El Paso, Tex.Civ.App., 1964, no writ hist.); and Sisttie v. Holland, 374 S.W.2d 803 (Tyler, Tex.Civ.App., 1964, no writ hist.).

We are conscious of a hypothesized situation where our conclusion could unfairly prejudice a litigant who has suffered a loss of his case by summary judgment or dismissal and sits idly for the time to come when the case is tried as to co-plaintiffs or co-defendants, after which he expects a judgment will be entered which is final and appealable. In such a situation he might become "rudely awakened" to the fact that unbeknownst to him the case as to all others has been disposed of without opportunity afforded him to file appeal bond, etc., in proceeding with requisite appellate procedure. It occurs to us that such a litigant might unfairly lose his right to appeal, or perhaps even to sue out a writ of error, under our conclusion upon applicable law.

■ But, under our understanding of the effect of the holdings in McEwen v. Harrison, 162 Tex. 125, 345 S.W.2d 706 (1961) and H. B. Zachry Co. v. Thibodeaux, 364 S.W.2d 192 (Tex.Sup., 1963) our answer to the question is correct; that in such a case the prior interlocutory order or judgment is brought forward and by implication made a part of the later decree; —and that if a notice of appeal be given on either occasion the required appellate steps will be treated as having begun, with the date the judgment is to be treated as "final" for purposes of appeal that on which the last judgment, order, etc., was signed. Thibodeaux v. H. B. Zachry Company, 368 S.W.2d 776 (San Antonio, Tex.Civ.App., 1963, writ ref., n. r. e.).

In any event there is no good reason to argue inapplicability of the rule in the present case. It is applicable and, under circumstances existent and displayed by our hypothetical question and answer, we hold that we have jurisdiction to determine the case. There was a final judgment from which an appeal was perfected.

### On the question of our jurisdiction over a particular appellee

It is interesting to note that the plaintiffs (who were in the position of A in our hypothesized question) did not give any notice of appeal to the October order of

dismissal rendered against them as to one defendant (in the position of B); and that the notice of appeal in the judgment instrument of January (in favor of all the other defendants in the position of C) merely consisted in language to the effect that plaintiffs "in open court excepted to this Judgment and now give notice of appeal * *."

It is the contention by Doctors General Hospital, Inc., one of the defendants who is an appellee before us (the one in the position of B in our hypothesized question), that we are without jurisdiction to consider the appeal as to it.

The contention is sustained. By the order dismissing the Doctors General Hospital, Inc. as a defendant there was no notice of appeal. Neither was there any other form of notice of appeal made or published under provisions of T.R.C.P. 353, "Notice of Appeal". The only notice of appeal was that noted in the body of the judgment rendered by the court following the December trial, the "take nothing" judgment rendered after the case was withdrawn from the jury. We have already noted the language by which such appears, viz: "* * in open court excepted to *this Judgment* and now give notice of appeal * * *." (Emphasis supplied.) In consequence of the foregoing it is our conclusion that the last judgment, but not the prior order of dismissal, was specifically made the subject of the appellants' notice of appeal; that our jurisdiction is invoked only as applied to the parties before the court in the December trial—not inclusive of the Doctors General Hospital, Inc., which had earlier obtained an order of dismissal of appellants' case as against it. There was no appeal bond, but in its stead appears a certificate by the clerk of the timely cash deposit in lieu of bond, in compliance with T.R.C.P. 354, "Cost Bond", and 356, "Time for Filing Cost Bond or Making Deposit". Nothing in the language thereof alters the situation, i. e., the only subject of complaint, because of which any notice of appeal was given, was the recitation of the judgment rendered following trial in December.

The language noted for (in behalf of) appellants on the face of the judgment would properly be considered as though the same language was embodied in a separate written instrument prepared by appellants and filed with the clerk as their notice of appeal in the case under T.R.C.P. 353, "Notice of Appeal".

Under the circumstances we hold that the doctrine embodied in the maxim *expressio unius est exclusio alterius* has application to the construction of appellants' notice of appeal. 53 Tex.Jur.2d, p. 205, "Statutes", Sec. 142 "Expressio unius rule". Since the doctrine has application to statutes, wills and contracts, certainly it would have application to appellants' motion for new trial. In this we are aided by language in H. B. Zachry Co. v. Thibodeaux, 364 S.W.2d 192 (Tex.Sup., 1963) wherein the matter of presence or absence of a notice of appeal as applied to an earlier order seemed to have been considered as matter of consequence. We do not reach the point for consideration of an altered circumstance where the complaining party did not restrict himself in the notice of appeal to a complaint of the last action of the court although there had been some former action of which complaint might have been made. Of this we express no opinion.

For want of appellate jurisdiction we dismiss the appeal in so far as it purports to obtain against Doctors General Hospital, Inc.

### On the merits of the appeal

In consequence the case on appeal is resolved into one whereby the appellants are the surviving husband and minor children of the decedent, Ella J. Webb. They contend that by the action of the trial court in withdrawing their case from the jury and rendering against them the "take nothing judgment" from which appeal has been perfected they were improperly denied their right to have the jury determine the liability

of the remaining appellees, Dr. Kenneth L. Jorns, Dr. E. D. Olcott, and Mrs. Irys Helen Eakin, in their suit for damages under Vernon's Ann.Tex.Civ.St. Title 77, Art. 4671, "Injuries Resulting in Death".

The test to be made is to determine whether the trial court was correct in the conclusion that appellants had failed to make out the requisite *prima facie* case on negligence and proximate cause. We have made such a test. Our conclusion and holding is that such was not proved.

Judgment is affirmed.

(In the event we err in the dismissal of the appeal as applied to Doctors General Hospital, Inc., our judgment would in that event be one of affirmance of judgment in respect to it as an appellee. Any liability attaching to it would be vicarious, under the doctrine of *respondeat superior,* because of negligence of parties who are present as appellees.)

As applied to the appellants' suit for malpractice it is to be remembered that on October 7, 1966, the decedent, Ella J. Webb, was in the operating room and on the operating table at the Doctors General Hospital in Fort Worth, Texas, undergoing anesthetic procedure preparatory to an intended radical operation to correct and repair a diaphragmatic hernia. Approximately thirteen minutes after the time when anesthesia was begun it was discovered that such patient was cyanotic and that a cardiac arrest had occurred. In other words it was discovered that Mrs. Webb's heart had stopped functioning in that there was no heartbeat. The doctors attempted resuscitation. The attempt failed and there was never any reversal of the cardiac arrest. The patient was pronounced dead.

We will first consider appellants' cause of action against Doctors Jorns and Olcott on negligence directly attributable to them —in respects other than predicated upon the theory of *respondeat superior* because they were in a sense the "captains of the ship". The trial court rendered its judgment, in part at least, on the theory that appellants had failed to make out the requisite *prima facie* case in such respect.

When the induction of anesthesia was instituted both Dr. Jorns and Dr. Olcott were present in the operating room, remaining there for a period of five to eight minutes and assuring themselves to their satisfaction that the patient was responding properly. Then they stepped into the adjoining "scrub" room—approximately nine feet away from the operating table on which the patient was positioned—where they were engaging in that "scrubbing" normally resorted to preparatory to surgery. Mrs. Eakin, the nurse anesthetist, called to them, and they heard, that she had noted a sudden absence of pulse and/or that the patient's welfare was a matter for their concern. They immediately ceased "scrubbing" and reached the patient's side in a matter of seconds. They observed that the patient was cyanotic and that there apparently was no pulse. The restraining straps holding the patient were cut and she was immediately placed in a recumbent position for the purpose of instituting what they considered to be the proper efforts at resuscitation.

Such efforts consisted in external cardiac massage, the one doctor alternating with the other, continuing for longer than twenty minutes and up until the patient was declared to be deceased. During the course of the procedure Mrs. Eakin was applying positive pressure controlling respiration, and the doctors could observe that such action was resulting in good activity of the chest in that the lungs were being inflated, etc., and that oxygen was being given. However, there was never any heartbeat. During the course of the attempts at resuscitation resort was had to a use of what is called a "defibrillator", an instrument designed to give an electric shock to the heart, used in this instance to give an electric stimulus as ancillary and helpful to the attempts in progress to reverse the cardiac arrest through the external massage. At no time was there observed any response

whereby the patient's heart appeared to have a voluntary beat, though the action taken to revive the patient extended beyond the recognized time when such response has been known to occur.

The alternative method to such efforts to revive the patient, not adopted in this instance though a method of which the doctors were aware and which they were qualified to perform and could have elected to perform, was one whereby the chest would be opened surgically so as to afford direct access to the heart, followed by its manual massage, and coupled with an injection of drug or drugs. The testimony of the doctors was that such alternative method was rejected and the former selected because of their opinion that the former was the preferable method; that by statistics the method adopted afforded the patient a better percentage as to her likelihood of having the arrest relieved and corrected and a resultant chance of survival.

In Gibson v. Avery, 463 S.W.2d 277 (Fort Worth, Tex.Civ.App., 1970, writ ref., n. r. e.) we had another instance in which there was experienced a cardiac arrest in the patient during the course of administering anesthetic preparatory for an operation. In that case resort was had to external heart massage. A ground for the negligence alleged against the doctors was impropriety in the method by which such was applied. The patient died on the table, the method adapted in attempts at resuscitation having failed.

In the instant case we abbreviate the points of error relative to the doctors' negligence in the words of the appellants, viz: "(The court committed error) in instructing a verdict where there was evidence raising a fact issue as to the proximate cause of ultimate death of Mrs. Webb being negligence of doctors in either (1) failing to institute open chest direct heart massage under the circumstances; (2) in failing to give any agent to counteract the effects of the arrest, or to assist in starting the heart; (3) in abandoning the efforts after twenty minutes; and (4) in failing to use available

equipment to determine the nature of the cardiac arrest, and in sustaining objections to testimony as to patient's chance of revival if proper procedure had been followed."

■■ The testimony mentioned in the above paragraph was excluded by ruling of the court without any complaint of such exclusion. As a consequence we deem the complaint presented by appellants, outlined above, as having been waived under the provisions of T.R.C.P. 372, "Bills of Exception". In any event the ruling out of the evidence was correct. The testimony constituting such was elicited from the appellants' medical expert, a Dr. Dannemiller. Dr. Dannemiller's answer was unresponsive to the question asked. Furthermore, it constituted hearsay as based upon expressions of undefined and unidentified authority never shown to have any qualification as a support.

■ The evidence which was stricken was the only evidence which could have constituted *prima facie* proof that the failure of the doctors—in respect to the negligence under consideration—was more than the probable cause of the failure of a revival by "at least 40 to 50 per cent". In other words the evidence, had it been admissible, might have perhaps warranted a submission of the case to the jury. It might be considered as having established that the doctors' failures in respect to resort to a method other than that which was selected was a proximate cause of the patient's death. However, without it there was no sufficient evidence that the patient's life would probably have been saved had they not so failed. Evidence that establishes no more than that the patient would have had up to a 50 per cent chance of survival had certain action been taken does not suffice to raise the question of proximate cause of the patient's death. There could have been no probable success in some other character of effort at resuscitation where its likelihood of·success was not shown by evidence to be greater than fifty per cent. In consequence the points of error in the other re-

spects mentioned are overruled as immaterial.

■■ Alternative to matters made the subject of the preceding discussion appellants alleged that "informed consent" for the operation was wanting.

When we consider the matter of informed consent for surgery there would, as included, be the matter of informed consent of the patient to submit to anesthesia preliminary to the institution of surgical procedures. Of this there was no evidence bearing upon applicable standards of medical practice requisite in such cases. Wilson v. Scott, 412 S.W.2d 299 (Tex.Sup., 1967). The point is overruled for want of a predicate. Any negligence which might have been existent in respect of surgery would be of no consideration because there was no surgery. Furthermore, in the appellants' brief is not to be found any discussion relating to any informed consent pertaining to the anesthesia. The substance thereof relates only to the surgery. Insofar as the point might have been material for our consideration it is not briefed. For that additional reason it is overruled.

■ We now consider the appellants' cause of action against Mrs. Eakin, the nurse anesthetist, and by and through her under the theory of *respondeat superior* against Doctors Jorns and Olcott. If the trial court was correct in concluding that the appellants failed to make out the requisite *prima facie* case against Mrs. Eakin by proving acts or omissions on her part amounting to negligence proximately causing the patient's cardiac arrest and consequent death the judgment would be correct as applied to Doctors Jorns and Olcott as well as to Mrs. Eakin. We find there was such a failure and that there is no necessity to investigate whether vicarious responsibility was actually existent on the part of the doctors.

At one time during the course of our test of the record there did appear to be an instance where appellants might be said to have discharged the requisite burden of proof as applied to Mrs. Eakin. Such proof lay in testimony elicited in reply to hypothetical questions put to appellants' medical expert witness, Dr. Francis Dannemiller. The probative force of such proof was destroyed, however, by further testimony elicited from this same witness on the cross-examination. This appears on page 472 of the Statement of Facts, and—abbreviated—was comprised of the following:

"Q. Doctor, am I correct, is it your testimony that in answer to Mr. Holloway's hypothetical question that you were assuming that the percentage of halothane was more than one and one-half per cent?

"A. It could have been.

"Q. But assuming that the percentage was one and one-half per cent, would your answer be the same?

"A. No, it wouldn't.

"Q. In fact, assuming that the percentage of halothane was one and one-half per cent, then you couldn't fault her (Mrs. Eakin) for the use of the halothane or the way she did it, assuming that the percentage was one and one-half per cent?

"A. For the administration of the halothane, I think that that is an acceptable technique of induction."

At no point in subsequent testimony, from this or any other witness, was the condition of appellants' proof restored to what it appeared to have been prior to the introduction of the evidence quoted.

As a matter of fact the percentage of halothane in the mixture of gases with oxygen being administered to the patient was shown to have been one and one-half per cent from the time Mrs. Webb began to receive her oxygen through a tube inserted through her mouth and throat into the proper point for supplying the patient's lungs in the respiration activity. Mrs. Eakin never altered the percentage at any time.

From Dr. Dannemiller's testimony what had been the original *prima facie* case for appellants on the "overdose of halothane"

feature, lay in his opinion that a relatively high percentage of halothane was proper to be administered to the patient in the initial period as a part of the gas mixture affording the patient oxygen by tube, after the tube was inserted and during the first few moments in which there was an accommodation of her respiratory activity to the tubular process; but that after the patient's accommodation thereto was established this percentage (of the halothane) should have been reduced so that a relatively lower amount would be received.

By the evidence was established the fact that halothane is a toxic drug. Had there been an issue upon Mrs. Eakin's negligence existent as a predicate fact issue would indisputably have been raised upon the question of whether the halothane, by reason of an "overdose" thereof to the patient, had such a toxic effect on her heart that the cardiac arrest occurred. The proof on negligence in the instant situation depended upon the creation of a fact issue as to whether, under standard and recognized safe practices, in the exercise of ordinary care and for the purpose of precaution against toxicity, Mrs. Eakin should have reduced the percentage of halothane in the gas and oxygen mixture once there had been an accommodation of the patient's respiratory processes to the tubular method of supplying such.

■ Relative to the matter of Mrs. Eakin's action, or failure in respect to action, the principles of law applicable to doctors and surgeons in malpractice cases would have full relevance. The test is whether there was a conformity to those standards of professional conduct justifiably expected of one engaged therein. In view of Dr. Dannemiller's testimony on cross-examination there was a negation of the efficacy of his prior evidence to make out a *prima facie* case that Mrs. Eakin was negligent in consequence of a failure of conformity in such respect. Such negation resulted because his own testimony showed that the prior testimony upon his opinion in response to a hypothetical question was

without application in this particular case. That was because the only evidence in the record was to the effect that the halothane in the mixture of gases never exceeded one and one-half per cent.

■ Indeed, Dr. Dannemiller was of the opinion (no doubt because there had been a cardiac arrest on the part of a patient whose general physical condition was apparently adequate for the purpose for the administering of anesthetic) that such arrest was "associated" with mismanagement of the anesthetic, a relative overdose of the halothane in the mixture of gases comprising the anesthetic, *or* an error in judgment and technique on the part of the nurse-anesthetist. Essentially, it seemed to have been his conclusion that something that Mrs. Eakin did—or failed to do—was wrong but exactly what it was he was unable to state. Such testimony would be improper under Snow v. Bond, 438 S.W.2d 549 (Tex.Sup., 1969). At one point he testified that in reasonable medical probability the patient's cardiac arrest and ensuing death was either an overdose of halothane *or* the overdose of such in combination with other factors, viz: not enough oxygen in the mixture of gases and/or the failure to timely discover that the patient had experienced a cardiac arrest. The substance of Dr. Dannemiller's testimony shows that he is dealing with "possibilities" rather than "probabilities", though at times he uses the term "reasonable medical probability". Courts will decide cases on the basis of substance rather than form. Lenger v. Physician's General Hospital, Inc., 455 S.W.2d 703, 707 (Tex. Sup., 1970). In any event the adequacy of Dr. Dannemiller's testimony (even if adequacy be assumed) was canceled by his express statement that if the percentage of halothane in the mixture of gases comprising the anesthetic was not more than one and one-half per cent Mrs. Eakin could not be faulted.

Viewing the situation as a layman the author of this opinion would be inclined to believe that it was probable that Mrs.

Webb's cardiac arrest was due to the effect that the halothane had upon her heart, without respect to the percentage thereof present in the gases. However, even though such might have been a cause of the heart failure such fact would have no importance unless there was some act or omission on the part of Mrs. Eakin which constituted negligence in causing or allowing whatever the percentage of the halothane might have been.

By the foregoing we know of one "possible" cause of the cardiac arrest and consequent death (for which Mrs. Eakin was not shown to have been responsible) to-wit: the reaction of the patient to the toxic drug halothane. Additionally there was shown by the evidence of another medical expert witness of appellants that there were other "possible" causes thereof. One of these was that there might have occurred an "air embolism", i. e., that air got in the blood through its intravenous "feeding" into the blood of the patient, and by its circulation reached the heart, in consequence of which there was cardiac arrest. Assuming equal probability in causation of the two "possible causes", which would be the state of this record, and furthermore, assuming that the latter condition arose in consequence of negligence on the part of Mrs. Eakin (which was not proved), yet it could not be said that a requisite *prima facie* case was established. A plaintiff cannot recover if he shows two "possible" causes, for only one of which the defendant is responsible, and there is no evidence to show which cause it was to which injury is actually attributable. This is often referred to as the "equal probability" rule established by Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779 (1949).

The equal probability rule having application, therefore, even should we consider one possible cause of the cardiac arrest to have been due to Mrs. Eakin's negligence, she must nevertheless be acquitted of liability because appellants' evidence must for that reason be deemed to have failed in respect to *prima facie* proof.

We have tested Mrs. Eakin's actions and want of actions in other respects asserted to have constituted negligence which proximately caused the event under consideration and have determined that as applied thereto appellants' proof did not entitle them to a submission of their case to the jury.

Mrs. Eakin was entitled to the judgment she obtained. Doctors Jorns and Olcott were properly acquitted in consequence in so far as the question of vicarious liability might be material.

Appellants contend that the case should have been submitted to the jury under the doctrine of *res ipsa loquitur*. Relative to the matter of cardiac arrest the appellants cite Harle v. Krchnak, 422 S.W. 2d 810 (Houston (1st), Tex.Civ.App., 1967, writ ref., n. r. e.) where the doctrine was considered to be applicable in a case where a sponge was left in the patient. They also cite two California cases involving cardiac arrest during the course of surgery where the doctrine was applied. Edelman v. Zeigler, 233 Cal.App.2d 871, 44 Cal.Rptr. 114 (1965); and Quintal v. Laurel Grove Hospital, 62 Cal.2d 154, 41 Cal.Rptr. 577, 397 P.2d 161 (Calif.Sup.Ct., 1964).

Undoubtedly there are exceptional cases in which the doctrine should be applied, but the rule in Texas is that it is generally inapplicable to malpractice cases. That is the subject of discussion in Harle v. Krchnak, supra, 422 S.W.2d at page 815 of the opinion. In this state the doctrine is merely a procedural device and rule of evidence which warrants or permits the inference of negligence but does not compel it; that permits a jury to find negligence, but does not require them to do so. *Res Ipsa Loquitur* in Texas, Morris, 26 Texas Law Review, pp. 257–272 and pp. 761–780; 40 Tex.Jur.2d 679, "Negligence", Sec. 149, "(Res Ipsa Loquitur) Effect of application". One of the basic facts which must be proved before the doctrine is shown to be applicable is that the occurrence is one that ordinarily does not happen unless there was negligence. The evidence in the record present-

ed on appeal, on the matter of that cardiac arrest or heart failure resulting in Mrs. Webb's demise, does not qualify as such proof. Indeed, appellants' own witness testified that such an arrest or failure "can and does" occur in spite of all precaution against it. The same thing might be said of the efforts at resuscitation. Without evidence, of course, the presumption would obtain that the appellees' full duty was discharged. To defeat the presumption appellants were obliged to produce affirmative evidence both as to the appellees' breach of duty and to the effect that such breach resulted in the cardiac arrest. The same thing would apply to the ineffective efforts to resuscitate.

We hold that the doctrine of *res ipsa loquitur* is without application to the case.

Whether discussed or not, all of the points of error presented by appellants have been severally considered and are overruled.

Insofar as the appeal pertains to the Doctors General Hospital, Inc., it is dismissed.

Insofar as the judgment pertains to Mrs. Irys Helen Eakin, Dr. Kenneth L. Jorns, and Dr. E. D. Olcott, it is affirmed.