**Robert WEBB et al., Appellants,**

**v.**

**Dr. Kenneth L. JORNS et al., Appellees.**

**No. 17615.**

Court of Civil Appeals of Texas, Fort Worth.

Oct. 10, 1975.

Rehearing Denied Nov. 21, 1975.

Rehearing Denied Dec. 19, 1975.

Holloway & Rhem, and John H. Holloway, Houston, for appellants.

Cantey, Hanger, Gooch, Cravens & Munn, and Richard L. Griffith, Fort Worth, for appellees, Kenneth L. Jorns, M.D., and E. D. Olcott, M.D.

Brown, Crowley, Simon & Peebles, and Richard U. Simon, Jr., Fort Worth, for appellees, Irys Eakin and Doctors General Hospital.

## OPINION

MASSEY, Chief Justice.

This is an appeal by plaintiffs in a malpractice suit for wrongful death from a take nothing judgment based upon jury verdict in favor of the defendant doctors, anesthetist and hospital.

We affirm.

The case has previous appellate history. See *Webb v. Jorns*, 473 S.W.2d 328 (Fort Worth, Tex.Civ.App., 1971, reversed at 488 S.W.2d 407). By the Supreme Court, in 1972, there was remand to the trial court. The instant appeal is from retrial. On the prior appeal this Court agreed that the trial court's directed verdict was correct in that by the plaintiffs' evidence no *prima facie* case had been proved; with which conclusion the Supreme Court disagreed and held that the case should be submitted to a jury for decision.

October 7, 1966, the plaintiffs' decedent, Mrs. Ella J. Webb, was in the operating room and on the operating table (at the premises of defendant Doctors General Hospital in Fort Worth, Texas) receiving the anesthetic preparatory to intended surgical operation to repair a diaphragmatic hernia. Approximately thirteen minutes after the time when the anesthetic was begun to be administered by the defendant Irys Eakin, anesthetist, it was discovered that Mrs. Webb was cyanotic and that a cardiac arrest had occurred. In other words it was discovered that Mrs. Webb's heart had stopped functioning in that there was no heartbeat. The doctors, defendants Eugene Olcott and Kenneth L. Jorns, attempted resuscitation. The attempt failed and there was no reversal of the cardiac arrest. The patient was pronounced dead. The material issues were upon the cause(s) of Mrs. Webb's cardiac failure and/or upon delay, if any, in its discovery, and/or impropriety or insufficiency in resuscitation efforts.

Dr. Jorns had been the attending physician prior to the time of Mrs. Webb's decision to undergo surgery. Dr. Jorns arranged with Dr. Olcott to perform the surgery, he to act as assistant. Thus the presence of these two doctors in the operating room on the material occasion and their efforts at resuscitation when Mrs. Webb's cardiac arrest occurred. Operative procedure, other than for preparatory measures and the administering of the anesthetic, never was begun.

Plaintiffs sought recovery upon theories, as follows: 1. negligence on the part of Dr. Olcott before there was decision to resort to surgery and preparations therefor made in the area of failure to obtain informed consent for the surgery (including anesthesia) with full disclosure of hazards necessarily incident, coupled with actual culpable conduct in representations upon the necessity for surgery; 2. failures on the part of Doctors General Hospital to have an adequate training program for procedures necessarily incident to the administering of anesthesia, and to have an adequate electrocardiograph machine available for immediate use incident thereto and to surgical procedures; 3. negligence on the part of Mrs. Eakin relative to the failure to act as circumstances

required in the preparation for administering and actual giving of the anesthetic, and/or negligence in the form and movements of the action she did take; 4. negligence on the part of both Dr. Olcott and Dr. Jorns, and/or either of them, in connection with negligent failure to use an electrocardiograph machine for diagnosis, to administer certain medicines or drugs, to check the patient, to properly place esophageal stethoscope, to continue resuscitation efforts, and to administer internal heart massage.

The jury found against the plaintiffs on all the liability issues, or sets thereof, or rather it might more properly be said that the jury refused to find for the plaintiffs on their issues.

The same is true as applied to the damage issues. On all of them the jury found zero dollars and cents to represent the loss occasioned by her death to her husband, her children, and her parents, all of whom had joined as plaintiffs in the case. From the record we have concluded that most of these answers constituted error. (Points of error 70–75, incl.) The error by the answers would not constitute reversible error if there was not reversible error in the jury findings upon liability. Here there was failure or refusal by the jury to find the fact of any defendant's negligence, and, where for purpose of inquiry a failure on the part of any defendant was assumed and the questions asked either as to negligence or proximate cause the jury refused to find that such constituted negligence or a proximate cause of Mrs. Webb's death (or cardiac arrest). Such liability findings (or refusals to find for the plaintiffs) are attacked in two ways. In most instances plaintiffs contend that the state of the evidence in the record is such that as a matter of law the contrary of the answers returned by the jury was compelled; in all instances their contention is that the answers were so contrary to the great weight and preponderance of the evidence as to be clearly wrong. We have examined the record and hold the attack made upon the jury's verdict under either contention to be without merit.

We list the material inquiries made by special issues in the court's charge, with the numbers of the special issues of importance indicated by parentheses.

On Dr. Olcott: Did he (1) fail to advise Mrs. Webb of the risk of fatality in connection with proposed surgery and anesthetic procedures; (4) fail to advise her of the radiologists' interpretation of the X-rays taken, as reflected by the X-ray reports in the hospital records; (10) fail to advise that her symptoms, if any, related to a diaphragmatic hernia, if any, could be treated medically with appropriate drugs, and that the suggested hernia surgery was recommended solely on her election to have the surgery if her symptoms were in her opinion "sufficient" that she did not want to live with them. Further, the jury refused to find that (7) Dr. Olcott advised Mrs. Webb that if she did not submit to surgery she might choke or strangle to death. Further, the jury found that (11) Mrs. Webb was suffering from a large diaphragmatic hernia, and (11–A) that Dr. Olcott's statement that she was suffering from such a condition was true.

On Doctors General Hospital: The jury refused to find (16) that the hospital failed to have an adequate training program of operating room personnel and staff physicians permitted to perform surgery, and to train them in standard procedures in the event a patient should suffer respiratory or cardiac problems during anesthetic procedures or surgery. The jury refused to find that (19) the hospital failed to have an electrocardiograph machine available for immediate use in the operating room in the event of cardiac problems.

General: The jury refused to find (45) that the respiratory or cardiac problems, or both, experienced by Mrs. Webb in the operating room was a direct or proximate result of an overdose of anesthetic agents.

On Drs. Olcott and Jorns (either and both) upon surgical preparation for operative procedure up to and after time of Mrs.

Webb's apparent death because of failure of resuscitation efforts to which there was resort: Upon "failures" assumed for purposes of special inquiry the jury refused to find negligence and also refused to find proximate cause in (22, 23, 24 and 25) any failure to use the electrocardiograph machine for diagnosis of the cardiac problem under the circumstances; and (26 and 27) refused to find negligence in the failure to administer sodium bicarbonate to Mrs. Webb during resuscitation efforts; (29 and 30), in the failure to administer Adrenalin (Epinephrine) or other cardiotonic drug to Mrs. Webb during resuscitation efforts; and/or (32 and 33) in the failure to administer internal heart massage. The jury refused to find that (14) Dr. Jorns failed to obtain Mrs. Webb's informed consent for the proposed surgery and anesthetic procedure. The jury refused to find Dr. Olcott negligent in (55–A) failing to place an esophageal stethoscope in Mrs. Webb to continuously monitor the patient's heart functions in a scheduled thoracic surgery; or in (48) failing to continue the resuscitation efforts past the period of time involved in such efforts. Further (41 and 42) the jury refused to find that Dr. Olcott and Jorns failed to check Mrs. Webb's lungs after discovery of her cyanosis to determine that she was receiving proper ventilation and oxygen. On the foregoing: as applied to Dr. Jorns there was no special issue inquiry relative to his failure to continue resuscitation efforts, nor to his failure to place an esophageal stethoscope in Mrs. Webb to continuously monitor her heart functions in her scheduled thoracic surgery. By jury answers noted to this point there was an acquittal of liability of all defendants other than Mrs. Eakin.

On Mrs. Eakin: By (52) the jury found that Mrs. Eakin failed to continuously monitor the heart of Mrs. Webb with a stethoscope after commencement of anesthetic drugs and prior to intubation with the endotracheal tube, but by (53), conditionally submitted, the jury refused to find that such failure was negligence. By (56) the jury refused to find a failure by Mrs. Eakin to maintain observation of Mrs. Webb's blood pressure, pulse rate, and vital signs during induction of the anesthetics, or (57) that Mrs. Eakin's failure, if any, was negligence, or (58) that such negligence, if any, was a proximate cause of death. In other issues where by the submission the fact of a character of "failure" on the part of Mrs. Eakin was assumed the jury refused to find her negligent (50) in the failure to use a four-liter flow of carrier gasses (2 liters of oxygen and 2 liters of nitrous oxide); and refused to find a proximate cause of Mrs. Webb's death by her (51) failure to use a four-liter flow of carrier gasses (2 liters of oxygen and 2 liters of nitrous oxide) with Halothane continuously. Where there was like assumption of some character of "failure" on the part of Mrs. Eakin in other special issues the jury refused to find her negligent by (54) failure to place an esophageal stethoscope in Mrs. Webb to continuously monitor her heart functions in a scheduled thoracic surgery or by (59) failure to have someone furnish Mrs. Webb adequate oxygen by timely and properly mashing the bag on the anesthetic machine (bag feeding and patient) between the time of the initial injection of 250 milligrams of Sodium Pentothal and the time necessary for Mrs. Eakin to change the I. V. to the patient's other arm, administer additional Sodium Pentothal and adding the moderate drip of Anectine, and then returning to the anesthetic machine to resume bag feeding the patient with oxygen. Further, the jury refused to find as matters of fact that Mrs. Eakin (35) failed to properly place the endotracheal tube in Mrs. Webb's trachea so as to maintain adequate and efficient ventilation of her lungs while anesthetics were being administered; (36) that she failed to maintain adequate and efficient ventilation of Mrs. Webb's lungs while she was "bag feeding" (controlled respiration) the patient prior to discovery of her cyanosis; (37) that she failed to check Mrs. Webb's lungs after intubation to determine if she was receiving proper ventilation and oxygen; or (40) that

she failed to check Mrs. Webb's lungs after discovery of her cyanosis to determine if she was receiving proper ventilation and oxygen.

By such jury answers Mrs. Eakin was acquitted of legal liability.

No special issue was submitted by affirmative answer to which there might have been found an agency of Mrs. Eakin for any other defendant as a principal (under doctrine of *respondeat superior*) though evidence in the record reflects that a fact issue had been raised thereon. Noted is the fact that Doctors Jorns and Olcott objected to the court's charge because of the absence of such an issue, thereby protecting themselves, but that plaintiffs made no similar objection. Neither was there submission of any issues by which plaintiffs might have established a right to recover under the theory of *res ipsa loquitur*. On appeal there is no complaint directed to any absence of special issues.

■ We take occasion to note that defendants insist that we are obliged to disregard complaints by plaintiffs that jury findings against them (or refusals by the jury to find for them) were either contrary to the great weight and preponderance of the evidence or that the contrary of jury findings were established as a matter of law in instances where there was conditional submission of additional special issues not answered by instruction of the court in the charge. Defendants contend that such issues, unanswered because the jury was instructed to answer only in the event they had found in the affirmative (or "Yes") to the issue or issues preceding, should be deemed to have been answered by the court in manner to support the judgment.

In other words, the defendants say that where there is failure on the part of the jury to find the fact desired by a plaintiff so that in obedience to the court's direction they do not answer another or other issues conditionally submitted and thus to be answered only in the event that the jury should first find the fact, then—in support

of its judgment—the court is deemed to have found answers thereto. They say that by implied findings of the court there was neither negligence or proximate cause of the plaintiffs' injury even if the jury erred in the fact finding upon which negligence and proximate cause inquiry was conditionally submitted. They say that where there is no complaint and preservation thereof on the presumed finding the conditionally submitted issues the finding presumed will stand in support of the judgment. They cite T.R.C.P. 279, "Submission of Issues"; *Little Rock Furniture Mfg. Co. v. Dunn*, 148 Tex. 197, 222 S.W.2d 985, 990, 991 (1949), and other cases.

We have considered the complaints of plaintiffs where their points contend answers returned were against the great weight and preponderance of the evidence. We reject the contentions of the defendants that such character of complaint can not be considered. In a "three-issue submission" (or more than such number) where there is conditional submission of special issues directed to be answered by the jury only upon returning the fact finding of certain character to the issue, upon which necessity for additional answers by the jury is made to depend, there is no authority for any presumed finding by the court upon any answer to issues conditionally submitted in Rule 279.

Where on appeal there is propriety to sustain the complaint by the losing party that the jury finding against him upon the issue upon which others are conditionally submitted is so contrary to the great weight and preponderance of the evidence as to be clearly erroneous, there is no prejudice to the complainants' right to have reversal because of any unanswered issues conditionally submitted. If reversible error is made to appear by the jury finding against the great weight and preponderance of the evidence reversibility is not to be deemed waived merely because there was no requirement of the jury that the conditionally submitted issues be answered. Complain-

ant is not obliged to have ever attacked the conditionally submitted issues or to have ever requested a different form of submission. *Strauss v. LaMark,* 366 S.W.2d 555 (Tex.Sup., 1963).

The Supreme Court, in *Strauss v. LaMark,* was writing upon an instance where the Court of Civil Appeals had held the answer of a jury which refused to find existence of the fact for which there was contention by a plaintiff to have been contrary to the great weight and preponderance of the evidence. There had been no answers returned to the conditionally submitted issues. The jury was instructed to answer these only in the event there was a contrary answer returned to that issue upon which they were conditioned. It would seem evident by the opinion that the same rule would apply where returning an answer to a proximate cause issue was made to depend upon a finding of negligence. Such rule would not apply where it is the contention on appeal that the contrary of `the answer returned by the jury was established by the evidence in the record as a matter of law for under the contention there would not, necessarily, be need for any supplementary conditional submission. Hence there would be "waiver" by failure to complain because of the conditional submission. The unanswered issue would there be regarded as having been answered by the court in such manner as to support the judgment. *Bell v. Aetna Casualty and Surety Company,* 394 S.W.2d 830, 834 (Houston, Tex.Civ.App., 1965, writ ref., n.r. e.); *Williams v. Bailey,* 471 S.W.2d 446, 448 (Waco, Tex.Civ.App., 1971, writ ref., n.r.e.). Hence our holding is that there has been waiver by plaintiffs under the theory that any answer contrary to that found by the jury was compelled as a matter of law while at the same time holding there was no waiver where the contention is that preliminary fact findings are contrary to the great weight and preponderance of the evidence.

We have, on the instant appeal, tested every answer of the jury by the evidence in the record. In no instance, except for the findings upon damages, do we find the answer returned to have been contrary to the great weight and preponderance of the evidence. Findings on the damage issues are immaterial in this case for reasons previously stated.

The trial court received a good verdict, upon the basis of which it rendered judgment.

▇▇▇ Following the return of the verdict of the jury the court proceeded to read to all present the questions and answers returned. There was a total of more than 63 of these. (Plaintiffs obtained submission of every special issue they desired in this case, apparently in language chosen by them.) By the time the court had completed the reading of the question and answer to Special Issue No. 40 it should have been apparent to plaintiffs, and probably was apparent, that the jury verdict would acquit Doctors General Hospital and Doctors Olcott and Jorns of liability, and probably would likewise acquit Mrs. Eakin. At this stage plaintiffs announced that they were taking a non-suit. If allowed the claims of all plaintiffs in the case, except the minor children of Mrs. Webb, would be subject to defeat in any suit subsequently brought by pleas of limitation on the part of any defendant who might wish to advance such.

The court denied plaintiffs' motion for non-suit. Because of this they claim reversible error. By T.R.C.P. 164, "Non-Suit", a plaintiff may take a non-suit in a jury case at any time before the jury has retired to consider its verdict. By inherent authority of the court in the exercise of its discretion it might thereafter allow the taking of non-suit up to the point in time when the jury's verdict has been accepted. *Albert v. Albert,* 377 S.W.2d 772 (San Antonio, Tex.Civ. App., 1964, writ ref., n.r.e.). Here the verdict had been returned but was not yet accepted. Anyway the motion for non-suit was made after the jury retired to consider its verdict and this was the time by which plaintiffs must have moved for non-suit if

they were to be entitled to it as a matter of right.

Plaintiffs claim further that the provisions of Rule 164 are unconstitutional. No authority is cited. We are unimpressed. We hold the rule and its provisions constitutional and overrule plaintiffs' claim of error in the refusal of their non-suit.

■■■ Further points of error are directed to the manner by which trial was conducted, in particular to the rulings of the court by which evidence thought to be improper and inadmissible was allowed to be placed before the jury by the defendants in the case, and to rulings of the court by which there was exclusion of evidence which plaintiffs desired to have before the jury. On the latter there is particular complaint of the denial to plaintiffs of the right to use recognized medical texts for impeachment purposes in the cross-examination of defendants' medical expert witnesses.

Did the trial court err in overruling plaintiffs' objections to answers by Dr. Olcott and defendants' expert, Dr. Ice, relative to possible causes of cardiac arrest in general? Error because thereof is the subject of complaint in plaintiffs' Points of Error 76 and 77. They maintain that the testimony from the doctors should have been limited to the medical probability for the cause of cardiac arrest in the case of Mrs. Webb, the deceased. Furthermore plaintiffs maintain that the testimony received over their objection was mere speculation and conjecture since experts must limit their remarks to medical probability, and that in their testimony they were basing inferences upon inferences.

In *Lenger v. Physician's General Hospital, Inc.*, 455 S.W.2d 703, 707 (Tex.Sup., 1970) it was actually held to constitute error to refuse to allow an expert medical witness to testify concerning the possible causes of a physical malady of a patient who lived. The rule should be the same as applied to one who died. The court held that expert testimony concerning the possi-

ble causes of the condition in question will often assist the trier of fact in evaluating other evidence; that if the witness be permitted to state his opinion only in terms of medical probability there would not be opportunity to decide the case on the substance rather than the form of his testimony, and that testimony on the possible causes of the malady by the expert witness should be admitted into evidence before the trier of fact. The rule of "reasonable medical probability" by expert testimony relates to the showing that must be made to support on ultimate issue of fact and not the standard by which the expert must testify.

As plaintiffs present it, "The 'sole purpose' of Defendant Olcott and Witness Ice in enumerating 'possible causes' of cardiac arrest was to detract the jury from qualified expert (plaintiffs') opinions in causation, and to interject 'speculation and conjecture' for the jury's deliberations." To a point plaintiffs' representation is correct, though the term "speculation and conjecture" is improper by *Lenger*, supra. By *Lenger* the testimony of Doctors Olcott and Ice concerning possible causes of cardiac arrests in general and/or in the specific case of Mrs. Webb served the purpose of assisting the jury to evaluate the evidence and opinions of plaintiffs' expert witnesses. It was properly admitted for this reason.

To be observed in the prior opinions (473 S.W.2d 328 and 488 S.W.2d 407) perhaps the strongest premise for plaintiffs' belief that liability exists in this case lies in their contention that there was mismanagement of the anesthetic and/or the oxygen supplied and administered to Mrs. Webb prior to discovery of her cardiac arrest. That was the contention in both the first and the second trial. On the instant appeal the contention of the plaintiffs is that the "oversupply" of Halothane in the anesthetic administered to Mrs. Webb—because of an "undersupply" of agents by which it, and other anesthetics including oxygen, was administered—at a time when the administering of the total anesthetic should have been

increased to a "four-liter flow"—amounted to negligence and proximate cause of Mrs. Webb's cardiac failure and consequent death.

By the time Dr. Ice, defendants' expert witness, gave his testimony it was already disclosed in the record that the manufacturer of the machine by which the Halothane (as a part of the mixture comprising the anesthesia) was administered recommended a per-minute "four-liter flow" of the agents incorporative of the Halothane at the material time. Testimony from Mrs. Eakin, the anesthetist, was that she never administered or increased the rate to as much as a "two-liter flow".

From other sources the jury was not left in doubt of the manufacturer's recommendations nor in doubt that plaintiffs' medical experts deemed such recommendations to constitute proper medical practice and a deviation therefrom as such improper procedure as to amount to malpractice. In other words the issue was raised. However the court refused to permit use of the manufacturer's recommendations to impeach the testimony of Mrs. Eakin and Dr. Ice. The manufacturer, probably a corporation, but in any event someone not proved to have been a medical expert, could not by its literature have established any medical standard for its use for purposes of trial in a court of law. Admission of such could prove nothing more than the fact that the manufacturer made a recommendation and the substance thereof. On cross-examination without the admission by the medical expert being interrogated (even one such as Mrs. Eakin, for the administration of proper anesthetic was indisputably within her field of expertise) that he honored and accepted the recommendations of the manufacturer as "authority" relative to the flow rate of the anesthetic and the proper mixture and percentage of drugs and ingredients therein the manufacturer's recommendation could never qualify as an exception to the general rule which excludes hearsay either from or as applied to the witness being interrogated. Even by such an ad-mission of the witness it would not be as original evidence proving something, but impeaching evidence merely as applied to the original testimony given by the witness who thereupon conceded it to be his "authority" or to be "standard authority".

There are a great many texts upon medical practice and expertise in the field of both the preparation and administration of anesthetics and in the field of cardiac failures and resuscitation procedures to which there should be resort in the event of its occurrence. It was by use of such texts that plaintiffs' attorney attempted to impeach some of defendants' medical experts, as well as Mrs. Eakin. Particularly was the effort to be observed in the instance of plaintiffs' cross-examination of Dr. Ice who refused to concede that anything written was considered by him to constitute "authority", though acknowledging that much written was "worth reading" and to be taken into consideration in the practice of medicine, and that in the view of some physicians—not himself—was "authoritative".

■ We may take judicial notice that there are medical and anesthetic experts in the medical field, and that they have written books in their fields of expertise. Of course what has been written is not original evidence. If the author of such a book was present he might give original testimony; if not what he has written may not be likewise given for the reason, among others, that he is not present so that he might be cross-examined. To show that to which he would have testified if present and subject to cross-examination, it is frequently desired to use a book that he has written. But this cannot be done unless a witness who has been qualified as an expert by a litigant's opponent has done both of two things, viz: (1) he must have testified that he recognized the absent author expert as "standard authority", or as "authority" by which he, at the material time, and as applied to the particular field of expertise upon which the book was written, was guid-

ed in the practice of his profession; and (2) he must have testified to the contrary of what is written in the book. When this condition exists that to which he has testified may be impeached by proving through use of the book the different opinion of the absent author, and/or something different in what should or should not be done in the circumstances. The statement above is somewhat abbreviated but is our "shorthand" statement of the rule. *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779, 783, 13 A.L.R.2d 1 (1949) and cases cited therein. A very recent case where the exact matter here discussed was treated in a case of similarity, with holding by the court like unto our own, was *Seeley v. Eaton*, 506 S.W.2d 719, 723 (Houston, Tex.Civ.App., 14th Dist., 1974, writ ref., n.r.e.).

To produce the statements from the book, as above, is done by what is commonly termed "impeachment of the witness". The theory of propriety of proof of statements therein is because of the acknowledgment of it by the witness as authority which is to be recognized and obeyed, accompanied by the witness' disobedience and/or negligent failure to obey. In practice it amounts to a manner by which a kind of original evidence is introduced before the jury as a by-product and consequence. In law it, in itself, never attains the stature of original evidence, for standing alone it would constitute mere hearsay. It would not support a judgment or issue in a case. *Bowles v. Bourdon*, supra.

In the present instance, and as applied to several instances of plaintiffs' attempt to cross-examine Mrs. Eakin and defendants' medical experts the court ruled that the books written by medical authorities in their fields of expertise could not be used. In other words plaintiffs were not permitted to read therefrom and ask the witness under cross-examination whether he conformed, etc. Included among the material in the books sought to be used was instruction and recommendations concerning the use of Halothane as part of the anesthesia. But plaintiffs' expert witnesses refused to concede that they recognized any such author or book as "authority". It was because of defendants' experts' refusal to so concede that the court denied plaintiffs any right to use the texts in their cross-examination. With some exceptions noticed in the record the same thing applied to Mrs. Eakin by her refusal to acknowledge as her "authority" certain matter written by experts in the anesthesia field. By *Bowles v. Bourdon*, supra, the court did not err in excluding or limiting cross-examination of any or the defendants' witnesses.

Plaintiffs quote in their brief as from McCormack and Ray on Evidence, p. 743. That which is quoted (per plaintiffs) is in the main philosophical. It apparently recognizes that most courts do allow the use of learned materials in the cross-examination of expert witnesses where the expert has relied upon such in forming the opinion to which he has testified on cross-examination. Observed thereafter is that some courts would require only that the witness acknowledge that the material sought to be used in his impeachment is recognized authority in the field though he has not relied upon it. The discussion continues in broadened areas of consideration in arriving at what the text authors seem to feel the rule should be rather than what it is generally acknowledged to be. What is impliedly observed is that ordinarily judgments of courts will not be reversed where on trial such evidence is either admitted or excluded.

Here the trial court excluded the evidence desired and we are not disposed to reverse the case because of the exclusion. We do not deem the exclusion erroneous. Even should it amount to error we hold that it did not constitute reversible error because any error by exclusion was not such as would be calculated to cause and probably did cause the jury to have returned a verdict different from that it would have returned had there not been an exclusion. T.R.C.P. 434, "If Judgment Reversed".

██ There is complaint by point of error because the trial court admitted into evidence, as part of the hospital records, a written instrument signed by Mrs. Webb consenting to surgery if there should be decision to resort thereto, and reciting that she had been informed of the "risks and complications" incident thereto, etc. The instrument was dated September 30, 1966, four days before Dr. Olcott ever saw her.

The complaint is overruled. Plaintiffs overlook the fact that Dr. Jorns was Mrs. Webb's attending physician and that he associated Dr. Olcott to perform the surgery, upon decision made to resort thereto. No issue submits inquiry upon Dr. Jorns' failure to obtain Mrs. Webb's informed consent. After Dr. Olcott became associated he discussed the situation with Mrs. Webb, and Dr. Jorns had previously discussed the situation with her. By direction of Dr. Jorns her hospitalization was for tests and possible surgery. The written "consent" instrument was evidentiary and admissible. Its weight and probative force and effect was for the jury. It did not prove a lack of informed consent. Information imparted to a patient contemplating surgery is ordinarily oral, rarely in written form. Such was the nature of the information, if any, imparted to Mrs. Webb in the instant case. The only evidence in the record is that there was informed consent in this case. If the jury had found informed consent wanting a contention by defendants that the finding was against the great weight and preponderance of the evidence might have been proper to be sustained.

Finally plaintiffs present a point of error by which they contend that a new trial should be ordered in the interest of justice because of the multiple probable errors. In the argument thereunder they refer to the probable suppression of their expert witnesses coupled with denial of right to impeach the expert witnesses of the defendants, plus the verdict of the jury representing jury bias and prejudice. We have considered the contention and overrule it. Points of complaint have been individually considered and rejected. The jury findings collectively, including those whereby it refused to find damages, do not in this case necessarily, or even probably, demonstrate that the jury was biased.

Judgment is affirmed.

## ON MOTION FOR REHEARING

██ Plaintiffs' counsel has pointed out that in the original opinion we failed to pass upon points of error whereby there was complaint because of the exclusion, on trial, of testimony from their expert witnesses, Drs. Dannemiller and Taylor, relative to the manufacturer's recommendations for the unit flow of gas required in the use of Halothane.

It is true that we overlooked writing thereupon. We did give the matter consideration as will be observed at the very beginning of the section of the opinion where we noted complaints concerning rulings of the court by which there was exclusion of evidence which the plaintiffs desired to have before the jury. We did fail to specifically rule on the particular complaint(s).

Relative thereto we remark that, as evidenced in the prior opinion, there is no doubt that the jury had before it by undisputed evidence the manufacturer's recommendations for the unit flow of gas. Testimony received left no doubt in the minds of the jury that plaintiffs' expert witnesses were of the opinion that to use such procedure as recommended by the manufacturer—without necessity of reference to the manufacturer's material by which those recommendations were evidenced—was correct procedure. Nor was the jury left in doubt that such witnesses were of the expert opinion that the procedure to which there was resort in the instant case was improper.

The points of error are overruled as constituting "harmless error". T.R.C.P. 434, "If Judgment Reversed".

On rehearing we have also reconsidered all those points of error, in addition to those presenting complaint here written upon, which plaintiffs contend were not passed upon. These we have concluded to be without merit and are all overruled.

Motion for rehearing is overruled.