**Dennis H. LENGER, Petitioner,**

v.

**PHYSICIAN'S GENERAL HOSPITAL, INC. et al., Respondents.**

**No. B–1496.**

Supreme Court of Texas.

June 10, 1970.

Hooper, Steves & Kerry, Sterling W. Steves and David F. Chappel, Fort Worth, for petitioner.

Cantey, Hanger, Gooch, Cravens & Scarborough, William B. David and Richard L. Griffith, Crumley, Murphy & Schrull, Franklin Moore, Fort Worth, for respondents.

WALKER, Justice.

The question to be decided in this case, which is closely akin to a medical malpractice suit, is whether there is any evidence to support a finding that the negligence of the defendants was a proximate cause of plaintiff's injuries and damage. Plaintiff is Dennis H. Lenger, who underwent surgery in a hospital operated by Physician's General Hospital, Inc. Defendants are Hospital, Mrs. Pauline Jones, who attended plaintiff as a nurse for several days, and Mrs. Berdena Hightower, d/b/a Adamson Nurses Registry, who sent Mrs. Jones to

Hospital. Their motion for instructed verdict was granted by the trial court, and the Court of Civil Appeals affirmed. 438 S. W.2d 408. We affirm the judgment of the Court of Civil Appeals.

There is little dispute as to the events leading to the suit. Plaintiff entered the hospital on August 3, 1965. He was a patient of Dr. Frank Rainone, who is a surgeon in Arlington. After a number of a diagnostic tests, Dr. Rainone operated on August 10. A colon resection was performed at that time to remove a cancerous growth located in the middle transverse section of the colon. Following the operation and a brief stay in the recovery room, plaintiff was removed to a private room. He was under morphine sedation, was being fed intravenously, and had a Levin tube inserted through the nose into the stomach, which was being evacuated by a suction pump. Dr. Rainone had ordered that plaintiff receive nothing by mouth and that he be attended by private nurses around the clock.

As a result of erroneous instructions given by Hospital's night charge nurse, the dietary department sent trays of solid food to plaintiff's room for each of the three meals on August 12. Plaintiff protested eating this food and requested that Dr. Rainone be called. Mrs. Jones, who was attending plaintiff at the time, stated that she would not bother the doctor and assured plaintiff that the food would not have been sent to his room if it were not all right for him to eat. Plaintiff then ate most of the breakfast. After eating he felt as though he had gas on his stomach, which was quite sore from the surgery. Plaintiff also ate the noon meal. That afternoon it again seemed that he had gas on his stomach and the Levin tube would not drain. The tube was irrigated several times by Mrs. Jones with the assistance of Mrs. Kathryn Garnett, Supervisor of Nurses for Hospital. Mrs. Garnett said the tube had been clogged by the food. The food was not removed from plaintiff's stomach. That evening he "felt terrible" and refused to eat the supper meal that was delivered to his room.

Plaintiff was given nothing more by mouth until August 13 when he was allowed to have a few ice chips, primarily to moisten his mouth and make him more comfortable. The Levin tube was removed on August 14, and the following day plaintiff was given water, ice chips and 7-Up. On August 16 he was placed on a full liquid diet. This diet included jello, beef broth, some of the thicker soups, certain cooked cereals, and soft drinks.

Plaintiff felt better for several days after August 12. During this period he was up from time to time, sat on the bed, moved around, and went to the bathroom. He began feeling worse on August 16, and his condition continued to deteriorate until Dr. Rainone operated again on August 20. It was then discovered that the two ends of the colon, which were sutured together during the first operation, had come completely apart. There was gas and fecal material in the abdominal cavity, and part of the small intestine had worked up into the colon at the point of separation. The small intestine had become so obstructed that it was filled with gas and its own secretions.

The colon could not be resutured because of the infection, and Dr. Rainone performed a double-barreled colostomy. On October 12 Dr. Rainone performed a third operation to undo the double-barreled colostomy. The remaining portion of the colon on the right side was then removed and the small intestine was joined to the descending colon on the left side of the body. Plaintiff was released from the hospital on October 30 and returned to work about five months later.

The evidence will support findings that defendants were negligent in the several respects alleged and that their negligence is causally related to plaintiff's eating the solid food on August 12. There is also evidence to warrant the conclusion that a person of ordinary prudence should have

foreseen that his eating the solid food at that time and under the circumstances might result in injury of some kind. The question here is whether the evidence will support the further conclusion that the two meals eaten by plaintiff were a cause in fact of his subsequent difficulties.

The proof that must be made to establish causal relation is easily stated in general terms, but it is often difficult to determine whether a sufficient showing has been made to warrant submission of the issue to the jury. Since liability cannot be made to turn upon speculation or conjecture, it is essential that the evidence show at least a reasonable probability that plaintiff's complications were caused by defendants' negligence. Insurance Co. of North America v. Myers, Tex.Sup., 411 S. W.2d 710. "The proof must establish causal connection beyond the point of conjecture. It must show more than a possibility. Verdicts must rest upon reasonable certainty of proof. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the jury can do no more than guess or speculate as to which was, in fact, the efficient cause, the submission of such choice to the jury has been consistently condemned by this court and by other courts." Ramberg v. Morgan, 209 Iowa 474, 218 N.W. 492. See also Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779.

The trier of fact is usually allowed to decide the issue of causation in cases of this nature: (1) when general experience and common sense will enable a layman fairly to determine the causal relationship between the event and the condition; (2) when scientific principles, usually proved by expert testimony, establish a traceable chain of causation from the condition back to the event; and (3) when probable causal relationship is shown by expert testimony. See Parker v. Employers Mutual Liability Ins. Co., Tex.Sup., 440 S.W.2d 43. This does not mean that the court, in determining whether the issue should be sub-mitted to the jury, must consider only evidence of one type to the exclusion of that falling into the other categories. In Insurance Co. of North America v. Kneten, Tex.Sup., 440 S.W.2d 52, the claimant suffered a heart attack shortly after sustaining an electric shock. The medical expert would only say that it was a strong possibility that the shock precipitated the attack, but his testimony did not rule out a medical relationship between the two. It was held that in view of the prompt onset of the attack following an event capable of causing it, the jury could reasonably conclude that the shock did, in fact, cause the attack. Expert testimony was thus relied upon to establish a possible causal relationship, but the jury was allowed to make the ultimate determination on the basis of general experience and common sense.

Turning now to the evidence in this case, Dr. Rainone was the only expert medical witness. He was quite positive in some of his statements and conclusions. It is his opinion that a hole or opening had first appeared in the mesentery or mesocolon, which is the tissue joining the colon to the abdominal wall. This hole or opening, which should not have been there, was underneath the colon at the point where the ends were sutured during the first operation. The small intestine had inserted or forced itself into the hole or opening and become obstructed. When the small intestine became obstructed it filled with gas and its own secretions. This caused pressure underneath the colon and forced the sutured ends of the colon apart. The obstruction of the small intestine was mechanical rather than functional. It was caused in this instance by the fact that the suture of the mesentery came apart for some reason.

Our question thus narrows to whether there is evidence to show that, in reasonable probability, the two meals were a cause in fact of the opening in the mesentery. Dr. Rainone stated that he did not know what caused it to come apart. At

that point the trial court sustained defendants' objection and refused to allow the witness to testify concerning the possible causes of the separation. This was error. As pointed out in Otis Elevator Co. v. Wood, Tex.Sup., 436 S.W.2d 324, the rule of "reasonable medical probability" relates to the showing that must be made to support an ultimate finding of fact and not to the standard by which the medical expert must testify. Expert testimony concerning the possible causes of the condition in question will often assist the trier of fact in evaluating other evidence in the case. If the witness were permitted to state his opinion only in terms of medical probabilities, moreover, the court and jury would have no opportunity to decide the case on the basis of the substance rather than the form of his testimony. In disposing of the present appeal, we consider all of Dr. Rainone's testimony, including that which was admitted and that which is found in the bill of exception.

The witness stated that the possible causes of the opening in the meso-colon are: (1) failure of the stitches to hold; (2) tension on the suture lines resulting from the twisting or other movements of plaintiff's body while he was walking, sitting up or turning over in bed; and (3) the solid food eaten on August 12. He did not regard causal relationship between the solid food and the subsequent complications as an unlikely possibility. "It would not be a great or overwhelming possibility, but there is a distinct possibility that this could occur * * * it would be a real possibility. If I didn't believe this, I wouldn't put a tube in anyone's stomach." Dr. Rainone insisted, however, that there is no way he could reasonably state what caused the meso-colon to come apart. This complication can occur despite all the precautions surgeons can take. "It's just as reasonable one thing could have caused it as another." The witness did not know whether the small intestine would have become obstructed if plaintiff had been given no food.

This evidence is not enough in itself to support a finding of causation. As pointed out in Parker, expert testimony that the event is a possible cause of the condition cannot ordinarily be treated as evidence of reasonable medical probability except when, in the absence of other reasonable causal explanations, it becomes more likely than not that the condition did result from the event. Dr. Rainone said nothing that can fairly be taken as an indication that he regarded the solid food as the more likely of the several possible causes.

Plaintiff insists that in view of the sequence of events, a lay jury could reasonably determine the issue of causation on the basis of general experience and common sense. Dr. Rainone supplied additional information that is relevant to this contention. The transverse colon is immediately under the stomach, and the weight of the solid food would cause the stomach to go down on the anastomosis. Plaintiff's stomach was not functioning properly at that time. It was in a state of ileus, which apparently is a condition of temporary, partial paralysis. This condition generally lasts "from a day and a half to two or three days and sometimes up to five days after an operation." The witness expressed the opinion, however, that the ileus was in existence when plaintiff was given the liquid diet on August 16. He wanted plaintiff's stomach to remain empty until the ileus was resolved. If food or fluid or air is allowed into the stomach while the patient has the ileus, a whole series of complications can develop. Patients with ileus are prone to swallow air, and "they get the small intestine full of air, the stomach and small intestine which is unable to pass except in small increments and gradually causes a distention of the abdomen." This causes the patient a great deal of distress. It can cause obstructions, tension on the suture lines, a variety of complications. "The main reason I personally use a Levin tube is to prevent this ileus from becoming so pronounced that it will cause complications on its own."

Despite plaintiff's argument to the contrary, the sequence of events here does not point to the solid food as a probable cause of the subsequent complications. There is no evidence to show when the meso-colon separated, and ten days elapsed between the two operations. During that period plaintiff consumed not only the solid food but also the liquid diet. It does not appear that the solid food put any more weight on the anastomosis than did the liquid diet, and Dr. Rainone was not asked whether it is more likely that one rather than the other caused the separation of the meso-colon. The evidence does not disclose whether the gas pains and other discomfort experienced by plaintiff on and for several days after August 12 were unusual or normal. During the ten-day period between the two operations, moreover, plaintiff was out of bed, sitting up and moving around. In accordance with Dr. Rainone's instructions, he sat on the edge of the bed, coughed and turned over in bed at regular intervals during the first two days following the initial operation. One of the forces suggested as a possible cause of his later difficulties was thus operating even before the solid food was eaten and for several days thereafter.

There are other circumstances that should be noticed. Dr. Rainone directed that two precautions be taken for the purpose of avoiding a number of complications. One of his orders was disregarded, and this was followed by separation of the meso-colon, one of the complications he wished to prevent. The evidence also indicates that the failure to observe his instructions with respect to food made the other precaution, i.e. the Levin tube, less effective than it otherwise would have been. On the other hand Dr. Rainone, who was familiar with all the facts, stated positively that there are three possible causes of the separation and that it is just as reasonable that one thing could have caused it as another. In view of this undisputed testimony by plaintiff's witness, it is our opinion that the circumstances mentioned do not establish a traceable chain of causation from the separation back to the solid food.

This is not a case in which general experience and common sense afford a reasonable basis for concluding that the two meals consumed by plaintiff on August 12 probably caused or contributed to his subsequent difficulties. The evidence does not disclose with what frequency surgical unions give way when the surgeon's instructions are observed in every respect after an operation similar to that performed on plaintiff. We are not told to what extent, if any, the solid food increased the danger that the stitches would simply fail to hold or be torn loose by the operation of other forces. Since the jury could only speculate as to whether the meso-colon would have separated if plaintiff had not been served the two meals, the trial court did not err in instructing a verdict for defendants.

The judgment of the Court of Civil Appeals is affirmed.

Dissenting opinion by POPE, J., joined by SMITH and McGEE, JJ.

POPE, Justice (dissenting).

I respectfully dissent. Dennis Lenger has been denied recovery because it is thought he did not prove that his second and third operations were in fact caused by the two meals of solid food which the nurses and hospital fed him one day after he had a colon resection. Lenger says the second and third operations would not have been necessary if his alimentary canal had not been contaminated with solid food at a time when his digestive tract was paralyzed and inoperative. I agree with Lenger.

The issue is a close one and the majority opinion correctly states the applicable law. Ours is a problem of applying the law. It is necessary that we keep in mind specific dates. The first operation was successful. It occurred on August 10. Lenger was

served prohibited solid foods twice on August 12. He did not receive anything by mouth thereafter until August 16, and that was a prescribed liquid diet. He had a life-saving second operation, a double barreled colostomy, on August 20. This operation was necessary because the sutures at the lower part of the transverse colon ruptured. Fecal matter escaped, and the ends of the parted colon were infected. The third operation on October 30 to undo the colostomy was successful, and Lenger recovered. We can understand causation in this case when we give consideration to the facts disclosed by (1) Dr. Rainone's preparation of the patient to avoid certain known results, (2) Dr. Rainone's explanation of the mechanical nature of the colon resection, and (3) the daily and hourly charts of the nurses.

Dr. Rainone carefully prepared his patient for the operation on August 10. He ordered a low residue diet for August 8 because he did not want any fecal matter in the colon during the operation. He ordered a laxative. He ordered a medicine to sterilize the bowel. On August 9, the day before the operation, Dr. Rainone orderd a soapsuds enema at bedtime "until clear." His written instructions were, *"Please* try to clean out thoroughly." Dr. Rainone testified that the reason he underlined "Please" was that he desired to emphasize the order. His written orders were that Lenger should receive nothing by mouth after midnight, except that at 4:00 a.m. Lenger was to receive a drug "to sterilize the colon." These orders were followed.

We move in time to the doctor's post-operative orders. Dr. Rainone first ordered that Lenger must receive nothing by mouth until August 16. Next Dr. Rainone ordered that a Levin Tube should be inserted through the nose into the stomach. This procedure is designed to suck the contents, even air, from the stomach as a means to render the stomach void. Since nothing would enter the patient's mouth, stomach, small intestine, or colon until August 16, the patient had to be sustained by intravenous feeding, so Dr. Rainone ordered that procedure.

Movement of the patient was important according to Dr. Rainone. Even for the day of the operation, the doctor ordered that the patient should "turn and cough" each two hours. He ordered that Lenger, on August 11, the day after the operation, should sit up, dangle his feet from the bed and cough. On the 12th, Lenger should get out of bed and sit in a chair. For the 13th, Lenger should get out of bed and into a chair and go to the bathroom. The nurses noted each of these movements. Dr. Rainone prescribed movement, because, in his words, "* * * the quicker we move them around, the less likelihood they are of having various complications, blood clots, pulmonary complications, etc." These orders were obeyed, and there is nothing which indicates any movements other than those in keeping with proper post-operative care and the doctor's orders.

Dr. Rainone prefaced his testimony about his operation by extensive explanation to the jury about the anatomy and the mechanics of the operation. With colored pictures, a projector, and a pointer, Dr. Rainone explained the anatomy and location of the stomach and the small and large intestines. He located the diseased tissue on the transverse colon which was directly under the stomach, and he explained how all of the diseased part of the colon was excised. The colon was then sutured together. The suture point was on the left side of the patient and directly beneath the stomach. He explained that the operation causes a state of paralysis of the stomach, small intestine and colon which continues from one and a half to five days. Since those organs would not be functioning, he explained that it was important to keep the stomach and bowel free of food and air, either of which causes gas. He said, "* * * where the stomach and intestine is not functioning properly, if food or fluid or air are allowed into the stomach, a whole series of complications can

develop." "They can develop acute gastric dilation which means the stomach can dilate to an enormous size * * * they can die with acute gastric dilation." In patients with ileus, "the stomach and small intestine which is unable to pass except in small increments and gradually causes a distention of the abdomen, causes them a great deal of distress, * * * it can cause tension on suture lines, it can cause a variety of reasons, a variety of complications * * *. The main reason that I personally use a Levin Tube is to prevent this ileus from becoming so pronounced that it will cause complications on its own." He explained that the weight of food in the stomach would cause the stomach to drop down upon the point of the sutures. He discovered by his second operation that the colon had separated and the small intestine had herniated into a small opening on the lower side of the colon at that precise point. Fecal matter and gas had escaped from the colon into the abdominal cavity.

The nurses' daily and hourly hospital notes show that the doctor's precautionary orders were disobeyed, and the precise complications which Dr. Rainone sought to avoid, in fact resulted. After the operation on August 10, things went well for a while. The notes of August 11 record each turn of the patient. At noon Lenger sat on the side of the bed and coughed. As the nurse noted, he had "a comfortable 8 hours." At 5:30 and again at 8:45, he again sat on the side of the bed and coughed.

In the early morning of August 12 at 12:20, the chart shows: "Up on side of bed for 10 minutes—coughed, * * * very talkative. States he is comfortable." At 7:00 a. m. "says he feels fine—smoking." The patient was in no distress up to this point, but the basis for this cause commenced at the next entry which was made at 7:45 a.m.

L/Residue Diet—ate fairly well drank juice and coffee. Some cereal, sm. amt. egg & (indecipherable)."

Lenger said he ate bacon, eggs, toast, coffee with cream and sugar and was not sure about the cereal and juice. He protested to the nurse, defendant Jones, that he was not supposed to eat solid food and besought her to check with the doctor. She said she was not going to "bother your doctor ever time a little something comes up." The nurse cut up the bacon and eggs for her patient. At 8:30 a.m., as common sense dictates, the Levin Tube was clogged. Mrs. Jones called the registered nurse for assistance.

The noon meal, consisting of chicken and dressing, was brought to Lenger's room. The nurse noted: "12:15, L/Res-Ate well." Lenger testified that he had a very bad afternoon. The Levin Tube would not drain and the head nurse again had to be called. Lenger said the tube was stopped up and would not let "this pressure, or gas, or whatever off my stomach and they said it was due to this food I had eaten." According to the head nurse, the opening of the Levin Tube was too small to suck out the food. Lenger refused to eat the evening meal because "I felt terrible." The nurses' notes show that the tube was not functioning at 8:00 p.m. At 9:30 he was restless and uncomfortable. At 10:35 he was "very uncomfortable, anxious and unhappy over the drainage of the Levin Tube. Tubing irrigated several times." At 11:40 he was "Still very unsettled. Tube stopped." He was given morphine for pain and at 11:55 the tube was irrigated. The notes for that time record, "Large amounts of very thick particles resembles mucous or bloodclots."

Early on August 13, the notes show that Lenger was "very talkative and concerned about drainage of Levin Tube." At 2:00 a.m., he complained of sharp gas pains in the abdomen, and the Levin Tube was irrigated several more times between midnight and eight in the morning. It was noted, "A restless aperhensive (sic) night." Except for nausea and pain, Lenger had a good day on the 14th.

The early morning of the 15th found Lenger in great distress. At 2:10 he complained of severe pain and cramping in the abdomen. At 3:00 and again at 4:30, he was given a suppository for gas pain. He went to the bathroom with no apparent relief. At 5:15 he was very uncomfortable and again went to the bathroom, but the chart noted, "Unable to expel gas." At 5:30 he was given medicine for pain, nausea and general discomfort. At 8:00 he again complained of gas pains. At 11:00 he was "Still very uncomfortable" and was again given medicine for pain. At 9:00 p. m. the notation was "Appears very upset."

On the 16th at 1:25 a.m., Lenger was awake and "complains of severe gas pains." At 5:45 he "expels large amount of flatus," but he had "A good night." It was on this date that Lenger commenced eating a prescribed liquid diet. Up to that time, all food by mouth had been prohibited. At noon on the 16th, Lenger complained of pain. Between 8:15 p.m. and midnight, these entries were made: "Appears to be very depressed. Complains of gas pains." "Complains of nausea." "Nauseated—vomited small amount clear fluid." "Complains of pain in the abdomen." "Complains of gas pains."

During most of the 17th, Lenger had a relatively quiet day according to the nurses' chart, but at 11:20 p.m. he was "Awake—complains of cramping in abdomen. Up to bathroom. Expels no gas." At 9:00 a. m. on the 18th he "states he still has pain and feels full." At 11:20, "Complains of severe pain in abdomen. States could be gas. Abdomen hard and distended." The doctor was notified. At 6:30 a.m. on the 19th, "Complains of slight pain and soreness in abdomen." At 4:00 p.m. "continues to complain of pain." At 6:00, "Compl. of gas pains * * * Expelled flatus." At 11:45 p.m. "Complains of severe abdominal pain," so he was given morphine for pain.

At 4:00 in the morning of August 20, "Cries out and holds abdomen when moves about on bed at intervals." At 6:00, "Complains of severe pain in chest and abdomen on changing body position," and was given morphine for pain. On this day he was operated a second time.

The instructed verdict for the defendant was sustained because the doctor would not testify that the forbidden food in reasonable medical probability caused the complications. He was willing to say "there is a distinct possibility, that it would not be a great or overwhelming probability, but there is a distinct possibility that" the food was the cause. He said, "Yes, it would be a real possibility. If I didn't believe this, I wouldn't put a tube in anyone's stomach." When asked the question whether "the feeding of * * *, two meals on top of a stomach that has ileus, would have the complications you have described," he said, "It is entirely possible." All of the medical testimony, however, was rubbed out by the doctor's saying on several occasions that he could only say that the food was one of several possible causes.

The doctor refused to use the word "probable" in stating his opinion. We need to examine the several suggested "possible" causes in the light of Dr. Rainone's medical evidence. Five possible causes are suggested, (1) failure of the stitches, (2) twisting and movement of the patient, (3) adhesions, (4) solid food ingested into the paralyzed digestive tract on August 12, (5) liquid diet ingested August 16 and thereafter. I can not equate these possibilities with the rule of equal inferences as defendants insist.

The record discloses that Dr. Rainone's sutures successfully joined the colon during the first operation. All of the evidence is that the diseased colon tissue was removed, and the healthy tissue was then joined. The doctor said, "I felt that we had obtained a clinically good result." His memorandum of the operation concluded, "The pt. tolerated the procedure and was returned to the RR (recovery room) in good condition." The doctor performed

two later operations on the same colon. He found, on his second operation, that the colon was infected from fecal contamination and cleaned it. On his third operation, he again sutured the same colon tissue and the tissue and stitches held. If the tissue was diseased or the suturing faulty, nothing appears in this record to show it.

Dr. Rainone prescribed movement and did so because he said it was good for the patient's recovery. He left written orders for the nurse to turn the patient and have him cough each two hours. His orders for the 11th were to have the patient sit up. For the 12th the doctor ordered that the patient should be out of bed and sit in a chair. The nurses recorded each time they moved the patient or assisted him in moving. The doctor and the nurses encouraged movement. There is no nurses' note nor testimony in this record of Lenger's having moved other than as ordered. The probabilities are that any unusual movements would have arisen from the unnecessary gastric discomfort caused by the food in his stomach which would not digest and the Levin Tube which was clogged. The third operation on Lenger found Dr. Rainone again ordering the same movement for his patient. That order and his no-food order were obeyed, and the sutures did not part.

The record does not disclose that Dr. Rainone discovered any adhesions when he operated the second time, ten days after the first operation. The doctor carefully examined the patient during the second operation. The memorandum of the operation did not mention adhesions, and the doctor did not testify that they were present. The three "possible" causes discussed above are merely possible causes in theoretical cases in which facts exist to show the possibility. The "possible" chances for such causations in this case are minuscule and suppositious.

The fourth and fifth "possible" causes concern the forbidden solid food on August 12 and the prescribed liquid diet on August 16. These medically proved facts show the probability that the two meals on August 12 caused the complications. The doctor carefully cleansed and sterilized Lenger's bowel before the operation. He ordered the Levin Tube for the purpose of avoiding air and gas in the stomach. He testified that the stomach and small and large intestines would be paralyzed for as long as five days after the operation. Lenger's recovery was normal until he received his first meal. Within an hour, the precise complication that Dr. Rainone feared, had occurred. Lenger received his next meal and within an hour the complications again occurred. We have already detailed the sequence of events in Lenger's worsening condition. They were a clogged tube, gastric discomfort, gas, pressure, cramping, the weight of food directly above the suture lines and a distended abdomen.

What happened to the food that Lenger ate on August 12? Dr. Rainone said, if it were not sucked out, it would pass "in small increments" out of the stomach and into the intestines. The proof is that it was not sucked out. The opening in the Levin Tube was too small, and that was why it was clogged that day and the next day. Lenger began his prescribed liquid diet on August 16. That was extra food on top of undigested food. It was additional weight placed in a stomach that had, at best, been passing solid food "in small increments." Basic to defendants' contentions that the prohibited food was not a probable cause of the small aperture in the colon which permitted the herniation of the small intestine, is that, in some unexplained way, the August 12 food just went away. There was proof that Lenger's colon suffered pressures both from within and also from the weight on the colon from the stomach.

A jury could compare Lenger's normal recovery from the third operation with his bad results from his first one. In both instances, the same doctor sutured the same tissue of the same colon and gave the same orders that the patient should have no solid food. The first operation was followed by

complications commencing with Lenger's eating forbidden food. Following the third operation, Lenger ate no solid food until the doctor permitted it. The first operation was followed by continuing trouble with the Levin Tube. The nurses' notes record nothing of that nature after the third operation. Instead, the nurses noted "running good" and "open and draining." It served its purpose of keeping air and gas out of Lenger's stomach. Lenger did not have the gastric disorders following his third operation that he endured following his first one. The August 12 food on the paralyzed stomach is the distinguishing factor.

Medical evidence of precautions taken to avoid a medically bad result are to me weighty medical proof of causation when those precautions are dishonored and that predicted bad result in fact occurs. This would be proof of probability in most of life's affairs. I find in this record good reason for Dr. Rainone's refusal to use the word "probable." He was given the impression that it means medical certainty. Plaintiff first asked Dr. Rainone his opinion by asking "* * * [W]hat would likely result from the feeding of the two meals to Mr. Lenger?" The court sustained an objection and said, "Well, the question is what would, not what did, * * *." Again the plaintiff posed the question, "What could have caused it to come apart?" Defense counsel interrupted, saying, "What did cause it to come apart?" Dr. Rainone answered, "What did cause it to come apart? I don't know what caused it to come apart." The doctor was twice instructed that "probable" means "did."

The doctor testified in answer to a question whether prohibited food upon a stomach that has ileus would cause the complications, and he answered "It is entirely possible." The margin between "entirely possible" which defeats and "in reasonable medical probability" which does not, is too thin to be sound. "Entirely" means wholly, exclusively, fully, completely. It leaves little room for other possibilities. In actuality, however, the doctor was testifying and not defining words. Perhaps we should define some words.

"Probable cause" is a term of logic. It means something more than "might cause." It means something less than "did cause." Dictionaries define "probable" to mean a strong likelihood or chance of something, that an event is likely to prove true. It means that there is more evidence for than against a conclusion. It includes partial knowledge and partial ignorance. To the degree that medical knowledge is increased, medical ignorance is decreased.

"What did cause?" asks about certainty, one hundred per cent conviction. It requires an absolute answer. "What might cause?" inquires about even the minuscule. But probability can coexist with many minuscule possibilities. Formal logic teaches that probability exists if the measure is something more than a fifty per cent chance.

In this case, we may measure the probabilities by the ample medical evidence, the prompt onset of expected complications after Lenger ate the prohibited food, and the fact that Lenger experienced a normal recovery after the third operation when he was not given prohibited food. Common sense and the sequence of events convince me that Lenger proved by medical testimony that the food in reasonable medical probability caused his trouble. I would reverse the judgments below and remand the cause for trial.

SMITH and McGEE, JJ., join in this dissent.