**Ludwig KUNA, Appellant,**

v.

**LIFEMARK HOSPITALS OF TEXAS, INC., d/b/a Park Plaza Hospital, Appellee.**

**No. 01–87–00221–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 10, 1987.

Rehearing Denied Jan. 14, 1988.

---

Sheri Soltes, Burrow & Williams, Houston, for appellant.

Randall E. Butler, Fulbright & Jaworski, and Thomas R. Connor, Smith & Connor, P.C., Houston, for appellee.

Before EVANS, C.J., and SAM BASS and DUGGAN, JJ.

## OPINION

EVANS, Chief Justice.

This is an appeal from an adverse judgment rendered against the plaintiff in a medical malpractice action.

The plaintiff, Ludwig Kuna, sued appellee, Lifemark Hospitals of Texas, Inc., d/b/a Park Plaza Hospital, alleging negligence on the part of Park Plaza's nursing staff. Specifically, Kuna alleged that the nursing staff had been negligent in failing to remove his surgical stockings and to bathe his feet on a daily basis. This, he contended, caused a sore on his toe, that resulted in gangrene and required the amputation of his toe. The case was tried to a jury, which found negligence on the part of the Park Plaza Hospital staff, and awarded Kuna $10,000 for past physical pain and mental anguish and $65,000 for past lost earnings. The trial court entered a take-nothing judgment notwithstanding the verdict, from which Kuna brings this appeal.

In Kuna's first three points of error, he contends that the trial court erred in granting the judgment n.o.v. because there was legally sufficient evidence to support the jury's finding that Park Plaza Hospital was negligent and that such negligence was the proximate cause of his injury.

In considering these points of error, we must view the evidence in the light most favorable to the jury findings for Kuna and determine whether there is any evidence in the record upon which the jury could have based its findings. *Dowling v. NADW Marketing, Inc.*, 631 S.W.2d 726, 728 (Tex. 1982).

Kuna testified that he was admitted to Park Plaza Hospital in February 1981 for neck surgery, which itself was successful. He was disoriented for several days after the operation, and when he finally regained consciousness, he was in a private room. As he approached consciousness, he felt a "terrible" pain in the little toe of his left foot. His wife helped him take off the surgical hose he was wearing, and he found that his toe was "dark, real dark, and all covered with blood." He testified that there was a substantial amount of blood all around the toe. He pointed out to the jury the main point of injury, which he said was "caused by the rubbing of the— they hadn't put on the hose properly...."

After Kuna was discharged from the hospital, his toe continued to hurt, and he had to use a walker to walk around. He kept putting ointment on the toe, but the sore did not heal. Two weeks later, gangrene developed, requiring amputation of the toe. Kuna testified that while he was waiting to go back to the hospital, he was in "terrible pain." He stated that he could not put any pressure on the toe, and that it hurt more than anything he had ever felt. Even after the amputation, the portion of the toe that had not been removed was very slow to heal, and kept "bleeding, and bleeding, and bleeding." Kuna was finally discharged from the hospital because his Medicare allotment had expired, but the wound did not completely heal for some 20 weeks. Mr. Kuna testified that he now cannot run, and he walks only with difficulty. It is a chore for him to climb stairs and to go downstairs. The surgery also resulted in what is called a "harmed toe" next to the one that was amputated, so Mr. Kuna

must cut a hole in every left shoe he wears to compensate for his harmed toe.

Mr. Kuna's wife testified that she stayed with her husband while he was in the Intensive Care Unit, but she did not have an opportunity to examine his legs or feet during that time. About the ninth day after surgery, he was transferred to a private room. She testified that as soon as he was in the room, he reached down to his left leg to pull off the hose. Mrs. Kuna helped him pull the surgical hose off his left leg, and she saw blood around his little toe. She called the doctor, who immediately gave Mr. Kuna a pain pill, and a nurse cleaned the toe and applied salve. Mrs. Kuna testified that the toe looked as though a scab had once formed on the sore and had been pulled off, letting fresh blood flow from the sore.

Mrs. Kuna further testified that she never saw anybody at the hospital take the surgical hose off Mr. Kuna's legs while he was in the Intensive Care Unit. She conceded, however, that they could have done so while she was not in the room. Mrs. Kuna demonstrated with her arm and finger how the elastic hose was situated on Mr. Kuna's foot when she first observed it. She indicated how the elastic was caught between his little toe, at the point where the sore was located, and she said that when she first saw his foot, his little toe was "curled back" and "stuffed down" underneath the surgical hose.

Kathryn McMillen, a registered nurse assigned to the Intensive Care Unit at Park Plaza Hospital, attended Mr. Kuna as her primary patient during one day of the time that he was in that unit. Nurse McMillen testified about certain acceptable standard procedures in her profession, and that the acceptable standard of care for an intensive care unit patient was a bath once a day, with removal of stockings and gown. She said this required taking the hose off for at least 10 minutes each day.

Nurse McMillen testified that she gave Mr. Kuna a bed bath on the day she attended him, and that she made a notation on her chart to that effect. She said she did not notice anything unusual about either his feet or toes on that occasion.

Another nurse, Linda Kay DeWitt, testified that she had also been assigned to the Intensive Care Unit of Park Plaza Hospital at the time Mr. Kuna was a patient there. She said that the nurses' notes on the patient's charts should reflect when the patient was bathed.

There was evidence that Mr. Kuna's feet were checked every day for pedal responses, and testimony indicated that this would have necessitated the removal of the surgical hose. Also, Mr. Kuna's hospital charts indicated that baths were given on a number of occasions. But because we may consider only the evidence in support of the jury's verdict in deciding a "no evidence" point, we disregard that evidence. *Dowling v. NADW Marketing, Inc.*, 631 S.W.2d at 726.

■ Although we find the evidence to be very weak on the negligence issue, we conclude that the jury could reasonably have inferred from the testimony that the hospital staff improperly placed Mr. Kuna's little toe under the surgical hose and that this condition went unattended for an extended period of time. Thus, the jury could reasonably have decided that the hospital nursing staff was negligent in failing to follow acceptable standard procedures for the care of a patient, i.e., removing surgical stockings from and bathing intensive care unit patients once a day.

Mr. Kuna was not required to offer expert medical testimony or direct evidence of the hospital's lack of care, *see Hilzendager v. Methodist Hosp.*, 596 S.W.2d 284, 286 (Tex.Civ.App.—Houston [1st Dist.] 1980, no writ); that element of proof could properly be inferred from circumstantial evidence. *See Washington v. Missouri K & T Ry. Co.*, 90 Tex. 314, 38 S.W. 764 (1897); *Kieswetter v. Center Pavilion Hosp.*, 662 S.W.2d 24, 29 (Tex.App.—Houston 1983, no writ). We therefore hold that the proof, while very weak, was sufficient to raise an issue for the jury on the question of the hospital's negligence.

We next conclude, however, that the evidence is legally insufficient to support the jury's finding on the issue of proximate cause. Under appropriate circumstances, a jury may rely on general experience and common sense in determining whether a particular act of negligence was the proximate cause of a specific injury. *See Lenger v. Physician's General Hospital, Inc.,* 455 S.W.2d 703, 706 (Tex.1970). In fact, in this case, the jury could reasonably have found that the improper placement of Mr. Kuna's toe under the tight surgical hose proximately caused the open sore on the toe. But whether this condition probably caused the resulting gangrene in the toe is a matter requiring expert medical testimony, *Kieswetter v. Center Pavilion Hosp.,* 662 S.W.2d at 27, and there is no such competent evidence in the record.

Because we find that there is no evidence to support the jury's finding on the issue of proximate cause, we hold that the trial court properly entered a take-nothing judgment notwithstanding the jury's verdict. In view of this holding, we need not consider Mr. Kuna's fourth point of error regarding the legal sufficiency of the evidence to support the jury's award of damages.

The judgment of the trial court is affirmed.