**Opinion issued November 26, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00587-CV

_____

**JACK THOMAS BADGETT, Appellant**

**V.**

**MONTE LAND G'SELL, INDIVIDUALLY, AND AS TRUSTEE OF MONTE LAND G'SELL REVOCABLE LIVING TRUST, Appellee**

On Appeal from the 113th District Court
Harris County, Texas
Trial Court Case No. 2019-42337

## MEMORANDUM OPINION

Appellee Monte Land G'Sell, in her individual capacity and as trustee for the

Monte Land G'Sell Revocable Living Trust, sued appellant Jack Thomas Badgett

for breach of fiduciary duty. Following a bench trial, the trial court determined that

Badgett breached his fiduciary duty and awarded G'Sell actual damages.[1] Among his appellate issues, Badgett challenges the legal and factual sufficiency of the evidence to support the actual damages award. Because we agree with Badgett that G'Sell offered legally insufficient evidence to prove that his breach of fiduciary duty to G'Sell caused her to suffer actual damages, we reverse the trial court's judgment and render judgment that G'Sell take nothing.

## Background

Badgett met G'Sell in 2000, after G'Sell retired from Chevron. G'Sell had received $156,000 in retirement funds from Chevron, and a work colleague referred G'Sell to Badgett, who had a securities license, to manage her retirement account. Later, Badgett's son Tom, who also had a securities license, took over the management of the retirement account.

---

[1]     In the trial court, Monte Land G'Sell Revocable Living Trust was listed in the style of the case as a plaintiff and listed as an appellee on the parties' briefs. Regardless of whether the trust was a proper party—*cf. Ray Malooly Tr. v. Juhl*, 186 S.W.3d 568, 570 (Tex. 2006) ("The general rule in Texas (and elsewhere) has long been that suits against a trust must be brought against its legal representative, the trustee.")—we note that the trial court's judgment awards G'Sell, not the trust, actual damages against Badgett. Thus, the trust itself is not an appellee in this appeal. *See* TEX. R. APP. P. 3.1(c) (defining appellee as "a party adverse to an appellant"); *Showbiz Multimedia, LLC v. Mountain States Mortg. Ctrs., Inc.*, 303 S.W.3d 769, 771 n.3 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (stating that "an appellee" must be party to trial court's final judgment).

2

In 2003, G'Sell inherited 5,024 shares of Exxon stock from her mother and began receiving dividends from the stock. The stock was in a brokerage account at a brokerage firm where Badgett, a registered representative, managed the account.[2]

In September 2012, the brokerage firm ceased offering the services of registered representatives to manage its customers' brokerage accounts. The brokerage firm informed its customers that they were required to manage their own accounts or to retain an authorized agent to do so. Badgett decided not to move his registration to a new brokerage firm and to retire from being a registered representative. In tandem with those decisions, he did not renew his securities license. Although he no longer worked as a registered representative, Badgett agreed to manage G'Sell's brokerage account as her authorized agent. G'Sell signed an authorization permitting Badgett to buy, sell, and trade "stocks, bonds, and any other securities" on her behalf. At the time, the brokerage account's value was around $300,000.

Between 2012 and 2016, G'Sell paid Badgett around $15,000 to manage her brokerage account. During that period, the account incurred a net loss of $347,298. In late 2016, G'Sell learned from Badgett that only $17 remained in her brokerage

---

[2] The brokerage account was held in the name of Monte Land G'Sell Revocable Living Trust for which G'Sell was the settlor and the trustee.

account.[3] Badgett told G'Sell that he had done "a lousy job" of managing the account. G'Sell moved her account to another firm and terminated Badgett's agency.

In June 2019, G'Sell filed suit against Badgett relating to the loss in value of her brokerage account. Her causes of action included common law and statutory fraud, violations of the Texas Securities Code, negligent misrepresentation, unjust enrichment, civil conspiracy, and breach of fiduciary duty. G'Sell asserted that she was entitled to disgorgement of the fees that she had paid Badgett and sought actual damages. Badgett answered the suit, generally denying the claims and asserting several affirmative defenses, including statute of limitations.

At the bench trial, G'Sell informed the trial court that she was pursuing only her claim for breach of fiduciary duty. Badgett and G'Sell each testified.

During his testimony, Badgett addressed why the brokerage account declined in value over the years that he was managing it. He explained that, in March 2012, G'Sell told him that she needed around $170,000 to build a new home. As an alternative to selling her Exxon stock—which at that time was worth around $400,000—Badgett informed G'Sell that she could "use[] margin on the account" and "borrow up to 50 percent of that," which would be around $200,000. Badgett testified that he explained to G'Sell that, when she sold her current home, she would need "to put those funds back in that account because the maximum margin that you

---

[3]     G'Sell's retirement account fared better with a balance at that time of $250,000.

can borrow is 50 percent." G'Sell borrowed $165,000 on the margin, which was about 45 percent of the value of the Exxon stock. Badgett testified, "[W]e withdrew those funds for her to buy her house which is not a very good position to be in." When asked why, Badgett described the pitfalls of borrowing on the margin. He explained that, if an account's value declines below the allowable "margin," the brokerage firm will issue a "margin call" to the customer to make up the margin deficiency. The customer can satisfy the margin call by either directing the broker to sell securities in the account or by depositing additional funds or securities into the account. If a customer receives a margin call and does not deposit additional cash or securities into the account to cover it, the brokerage firm then has the right to sell securities to increase the account's equity until it is above the maintenance margin. Badgett testified that G'Sell never deposited funds into the brokerage account to replace the $165,000 she borrowed. He also explained that margin interest was added to the amount owed.

Badgett stated that, during the period of 2013 to 2015, oil prices dropped substantially resulting in lower petroleum stock values. The value of G'Sell's brokerage account declined below the allowable margin, which triggered margin calls on the account. Badgett testified that he was forced to sell stock to cover the margin deficiency. The brokerage account's value dropped $128,000 from $215,132 in August 2014 to $87,000 in January 2015. Badgett testified that drop "only

occurred because of the margin calls." He said that, although he could not prevent the decline in value from the margin calls, G'Sell could have prevented it by depositing funds into the account after she sold her home.

Badgett also testified that G'Sell's brokerage account lost value because of stock trades that he made. Badgett testified that the Exxon stock was important to G'Sell because she wanted to receive dividend income. Because Exxon paid lower dividends than other stock, Badgett traded the Exxon stock for stock paying higher dividends. However, that stock then lost value. For instance, he acquired stock in Lion Energy, which paid higher dividends than Exxon, but Lion Energy "unfortunately went bankrupt." Because he believed that G'Sell should switch from petroleum stock, Badgett traded for stock outside that industry, but that stock also lost value. Badgett stated that another reason the brokerage account lost value was because G'Sell periodically withdrew cash from the account.

Badgett acknowledged that G'Sell was a "passive investor" and had relied on him to manage the brokerage account. He testified that as her authorized agent he "was authorized to do virtually any trading whatsoever totally at [his] discretion," and he "was fully authorized to handle every aspect of the brokerage account." He agreed that he had a fiduciary relationship with G'Sell while he was her authorized agent. Badgett testified that he "generally" told G'Sell that his stock trading was losing money for the account, but he never discussed any specific amounts relating

6

to specific trades. He did not recall the dates that he informed her about the loss in value but said that he told her about the general loss "several times."

The record showed that the brokerage account lost $94,383 in 2014, $44,983 in 2015, and $163,671 in 2016. Badgett acknowledged that he did not tell G'Sell about the specific amount of those losses when they occurred. When asked whether he told G'Sell that he "was losing hundreds of thousands of dollars in her account," Badgett responded that he did not tell her that. When asked why, he said that he had "no idea." However, Badgett pointed out that G'Sell was provided with tax documents reflecting the specific amount of losses each year. Badgett also pointed out that G'Sell received monthly statements for the brokerage account.

G'Sell testified at trial that she "depended on [Badgett] completely" to manage the brokerage account. She acknowledged that she received "periodic statements" for the account but said that she did not understand them.

G'Sell denied that Badgett had discussed the margin calls on her account with her. G'Sell acknowledged that she had taken cash withdrawals from the brokerage account such as a $10,000 withdrawal to pay her son's property taxes. She confirmed that Badgett had not told her about the losses in the brokerage account that occurred from 2014 to 2016. She testified that she did not know that Badgett had sold her Exxon stock until late 2016 when she learned that less than $20 remained in the brokerage account. When she learned that information, she was "dumbfounded."

7

The evidence also showed that, separate from the instant suit, G'Sell had already obtained an arbitration award of $111,000 against the brokerage firm and from Badgett's son, Tom. When asked, G'Sell agreed that $111,000 should be deducted from any damage award that she recovered from Badgett.

In closing argument, G'Sell emphasized that she was "not [t]here to complain about how [Badgett] handled [her] account." She explained that "one of the golden rules of a securities litigation is that a broker cannot be liable for things that are beyond his control in the stock market" and said that "[she] acknowledge[d] that." G'Sell stated that Badgett's fiduciary duty to her included "the duty of candor" and told the trial court that "this case is about a failure to communicate." She argued that Badgett breached his fiduciary duty because "he didn't disclose to [her] that [her] account] was plummeting in value in 2014, '15 and '16." She added, "[W]hat we're here for today is the breach of the . . . duty of full and fair disclosure. That's what this case is about."

G'Sell asked the trial court to award her actual damages, minus the $111,000 arbitration award. She asserted that she was "entitled to an award of disgorgement of the fees that [she] paid to J.T. Badgett in the amount of [$]15,000" and asked the trial court to award her exemplary damages. The trial court rendered judgment in G'Sell's favor, awarding her $196,037 in actual damages. The trial court did not

8

grant G'Sell's requested equitable remedy of disgorgement and did not award her exemplary damages against Badgett.

The trial court later signed findings of fact and conclusions of law. Among its findings and conclusions, the trial court determined: (1) Badgett "agreed that a fiduciary relationship existed between the parties"; (2) it "was undisputed that [Badgett] failed to provide Ms. G'Sell updates on her investment"; (3) G'Sell did not learn until late 2016, "when [Badgett] ceased servicing her account, that there was essentially 'no money left in the account'"; (4) Badgett "admitted that he lost $347,298 in the [Brokerage] Account between 2012 and 2016" and admitted that he did "a lousy job"; (5) Badgett was entitled to a credit for the $111,000 arbitration award to G'Sell; (6) Badgett was "liable to [G'Sell] for breach of fiduciary duty"; (7) Badgett's "breach of his fiduciary duty caused harm to [G'Sell]"; (8) the brokerage account "suffered a [net] loss of $307,037 ($98,383 in 2014, $44,983 in 2015, and $163,671 in 2016)"; (9) "[G'Sell's] harm was not the result of [Badgett's] fraud, malice, or gross negligence, and as such [Badgett's] conduct [did] not justify an award of exemplary damages"; and (10) "[u]nder [her] breach of fiduciary duty claim, [G'Sell was] entitled to recover $196,037, i.e., $307,037 (net account loss) [minus] $111,000 (reimbursement via . . . arbitration award)."

9

## Sufficiency of the Evidence

Badgett raises four issues on appeal to challenge the trial court's judgment. Because it is dispositive, we address only the fourth issue in which Badgett challenges the legal and factual sufficiency of the evidence to support the causation element of G'Sell's breach-of-fiduciary-duty claim. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

### A. Standard of Review

In a legal-sufficiency review, we must consider all the evidence "in the light most favorable to the party in whose favor the verdict has been rendered," and "every reasonable inference deducible from the evidence is to be indulged in that party's favor[.]" *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).

In a factual-sufficiency review, we set aside a finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016); *see Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (instructing that, when party complaining of factual insufficiency did not have burden of proof at trial, we conduct our review by considering all record evidence both for and against finding). When conducting a factual-sufficiency review, a court of appeals must not merely substitute its judgment for that of the factfinder. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Zenner v. Lone Star Striping & Paving L.L.C.*, 371 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). In resolving factual disputes, the trial court may choose to believe one witness and disbelieve others, and it may resolve any inconsistencies in a witness's testimony. *Id.*

## B.    Relevant Legal Principles

Generally, the elements of a breach of fiduciary duty claim are (1) the existence of a fiduciary duty; (2) breach of the duty; (3) causation; and (4) damages. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220

11

(Tex. 2017). A plaintiff cannot recover an award of actual damages on a breach-of-fiduciary-duty claim unless she proves "that the defendant's breach of their fiduciary duties proximately caused the plaintiff's damages."[4] *Finger v. Ray*, 326 S.W.3d 285, 291 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *see Bos v. Smith*, 556 S.W.3d 293, 303 (Tex. 2018). Proximate cause has two components: (1) foreseeability and (2) cause in fact. *Bos*, 556 S.W.3d at 303. "Cause in fact is essentially but-for causation." *Ryder Integrated Logistics, Inc. v. Fayette Cnty.*, 453 S.W.3d 922, 929 (Tex. 2015). "Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 799 (Tex. 2004). If the defendant's negligence merely furnished a condition that made the injuries possible, there is no cause in fact. *See id.* Proximate cause "cannot be established by mere conjecture, guess or speculation." *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). To establish causation, the evidence "must show

---

[4]   We note that the Supreme Court of Texas has held that a plaintiff asserting a claim for breach of fiduciary duty need not show causation or actual damages to be entitled to an equitable remedy for the breach. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 221 (Tex. 2017). Here, G'Sell sought the equitable remedy of disgorgement of Badgett's fees, but the trial court did not grant that remedy. The trial court awarded actual damages—damages which G'Sell was required to prove were proximately caused by Badgett's breach of fiduciary duty. *See Bos v. Smith*, 556 S.W.3d 293, 303 (Tex. 2018); *Parker*, 514 S.W.3d at 221.

more than a possibility." *Lenger v. Physician's Gen. Hosp., Inc.*, 455 S.W.2d 703, 706 (Tex. 1970). "Verdicts must rest upon reasonable certainty of proof." *Id.*

## C.  Analysis

The trial court found that "[Badgett's] breach of fiduciary duty caused harm to [G'Sell]," namely, that "[t]he the [Brokerage] Account suffered a [net] loss of $307,037 ($98,383 in 2014, $44,983 in 2015, $163,671 in 2016)." After offsetting the arbitration award, the trial court awarded G'Sell actual damages of $196,037. Badgett asserts that "the evidence clearly fail[ed] to sustain the causation and damages requirement to support [G'Sell's] breach of fiduciary duty claim." [5] We agree.

G'Sell asserted that Badgett breached his fiduciary duty because he failed to inform her that the brokerage account was declining in value. As discussed, G'Sell emphasized in her closing argument that she was "not [t]here to complain about how [Badgett] handled [her] account," explaining that "one of the golden rules of a securities litigation is that a broker cannot be liable for things that are beyond his control in the stock market." G'Sell stated that Badgett's fiduciary duty to her

---

[5]  In her brief, G'Sell asserts that Badgett's appellate argument fails because he attacked only the trial court's judgment as a whole, rather than specific findings of the trial court. We are required to "liberally construe issues presented to obtain a just, fair, and equitable adjudication of the rights of the litigants." *El Paso Nat. Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 316 (Tex. 1999). A review of Badgett's brief shows that he has sufficiently challenged the trial court's causation finding.

included "the duty of candor" and told the trial court that "this case is about a failure to communicate." She argued that Badgett breached his fiduciary duty because "he didn't disclose to [her] that [her account] was plummeting in value in 2014, '15 and '16." She added, "[W]hat we're here for today is the breach of the . . . duty of full and fair disclosure. That's what this case is about."

On appeal, the dispositive inquiry is whether the record contains evidence showing that Badgett's failure to inform G'Sell about the declining value of her account proximately caused her damages—those damages being the brokerage account's lost net value of $307,037. In so doing, we determine whether the evidence reflected that Badgett's omission—that is, his failure to disclose to G'Sell that her account was losing value—was the cause in fact of her damages. For Badgett's non-disclosure to be the cause in fact, the evidence needed to demonstrate that it was a substantial factor in bringing about the brokerage account's loss of value, and that, if he had disclosed the information, the account would not have lost its value. *See IHS Cedars Treatment Ctr.*, 143 S.W.3d at 799.

The evidence showed that G'Sell's brokerage account lost value due to several factors, including G'Sell's withdrawal of cash, Badgett's sale of stock from the account to satisfy the margin calls, and Badgett's poor stock trading choices. The parties did not dispute that Badgett had the authority to take these actions as G'Sell's authorized agent. The evidence showed that, if Badgett had not sold stock from the

14

account to satisfy the margin calls, the brokerage firm would have selected and sold securities from the account to cover the margin deficiency. G'Sell emphasized in her closing argument that her breach-of-fiduciary-duty claim was not based on Badgett's handling of the account. She recognized that Badgett could not be held liable for the uncertainty of the stock market. And, even if Badgett's handling of the account could be considered negligent, G'Sell did not pursue a negligence-based claim at trial.

As mentioned, G'Sell's breach-of-fiduciary-duty claim was based on Badgett's failure to disclose to her that the brokerage account was losing value in 2014, 2015, and 2016. G'Sell asserts that the non-disclosure caused her account to incur a net loss of $307,037. But, even when viewed in the light most favorable to G'Sell, the record contains no evidence from which a reasonable inference could be drawn that the non-disclosure was a substantial factor in bringing about the brokerage account's loss of value, and that, if Badgett had disclosed the information, the account would not have lost its value. In other words, there was no evidence that the non-disclosure was the cause in fact of the loss. *See id.* G'Sell did not offer evidence showing that, if she had learned of the declining value earlier, such as in 2014 or 2015, she would have terminated Badgett's agency at that time. Nor did she offer evidence showing that, if she had terminated Badgett's agency earlier, the brokerage account would not have lost its value or would have loss less.

"Damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference from known facts." *Tate v. Goins, Underkofler, Crawford & Langdon*, 24 S.W.3d 627, 635 (Tex. App.—Dallas 2000, pet. denied). Although "uncertainty as to the *amount* of damages is not fatal to recovery, lack of evidence or uncertainty as to the *fact* of damages is." *Id.*

The record contains no evidence from which the trial court could have found, without speculating, that G'Sell suffered actual damages as a result of Badgett's non-disclosure. Some measure of damages may have been recoverable for the alleged breach of fiduciary duty, but G'Sell did not present any evidence to support that recovery at trial. We hold that the evidence was legally insufficient to show that Badgett's non-disclosure about the decline in the brokerage account's value proximately caused the account's loss in value. *See In re M.G.G.*, No. 05-19-00777-CV, 2020 WL 4581646, at *5 (Tex. App.—Dallas Aug. 10, 2020, no pet.) (mem. op.) (holding evidence was legally insufficient to support breach-of-fiduciary-duty claim because appellee did not offer evidence proving that alleged breach caused actual damages awarded).

We sustain Badgett's fourth issue.[6]

---

[6] Because the fourth issue is dispositive, we need not reach Badgett's first three issues challenging the trial court's judgment. *See* TEX. R. APP. P. 47.1.

16

## Conclusion

We reverse the judgment of the trial court and render judgment that G'Sell take nothing against Badgett.


Richard Hightower
Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.