Owens v. Perez


















NUMBER 13-01-00876-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI – EDINBURG
                                                                                                                       

EDWIN OWENS, M.D.,                                                                 Appellant,

v.

DOMINGO PEREZ AS NEXT FRIEND
OF MARIA SAN JUANA MORIN, 
A NON COMPOS MENTIS,                                                            Appellee.
                                                                                                                       

On appeal from the 138th District Court of Cameron County, Texas.
                                                                                                                       

O P I N I O N

Before Justices Hinojosa, Yañez, and Garza
Opinion by Justice Hinojosa

          This is a medical malpractice case. Appellee, Domingo Perez (“Perez”), as next
friend of Maria San Juana Morin (“Morin”), a non compos mentis, sued appellant, Edwin
Owens, M.D. (“Dr. Owens”), and others


 after Morin, suffered a third-degree burn to her
arm during or after out-patient eyelid surgery. A jury found that Dr. Owens, the
anesthesiologist during the surgery, was thirty percent responsible for the negligence that
caused the burn and found damages totaling $500,000. In four issues, Dr. Owens
contends: (1) the evidence is legally and factually insufficient to show that he caused the
burn; (2) the trial court abused its discretion in excluding the testimony of Margie Cornwell,
M.D. (“Dr. Cornwell”); (3) the evidence is legally and factually insufficient to support the
medical damages awarded by the jury; and (4) the trial court abused its discretion in
appointing an ad litem to represent Morin’s interests and taxing ad litem fees against him. 
We reform the trial court’s judgment and, as reformed, affirm.
I. Sufficiency of the Evidence
          In his first issue, Dr. Owens contends the evidence is legally and factually
insufficient to establish that he breached the standard of care or that he proximately
caused appellee’s burn. 
A. Standard of Review
          When we review a “no evidence” or legal sufficiency of the evidence issue, we must
view the evidence in a light that tends to support the finding of the disputed fact and
disregard all evidence and inferences to the contrary. Bradford v. Vento, 48 S.W.3d 749,
754 (Tex. 2001). A no evidence issue will be sustained when the record discloses that: 
(1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove a vital fact;
(3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the
evidence conclusively establishes the opposite of the vital fact. Merrell Dow Pharms. v.
Havner, 953 S.W.2d 706, 711 (Tex. 1997). If there is more than a scintilla of evidence to
support the finding, the no evidence challenge fails. Stafford v. Stafford, 726 S.W.2d 14,
16 (Tex. 1987). When the evidence offered to prove a vital fact is so weak as to do no
more than create a mere surmise or suspicion of its existence, the evidence is not more
than a scintilla and, in legal effect, is no evidence. Kindred v. Con-Chem, Inc., 650 S.W.2d
61, 63 (Tex. 1983). More than a scintilla of evidence exists where the evidence supporting
the finding, as a whole, rises to a level that would enable reasonable and fair-minded
people to differ in their conclusions. Havner, 953 S.W.2d at 711.
          When we review an “insufficient evidence” or factual sufficiency of the evidence
issue, we consider, weigh and examine all of the evidence which supports or undermines
the jury's finding. Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989). 
We review the evidence, keeping in mind that it is the jury's role, not ours, to judge the
credibility of the evidence, to assign the weight to be given to testimony, and to resolve
inconsistencies within or conflicts among the witnesses' testimony. Wilhelm v. Flores, 133
S.W.3d 726, 732 (Tex. App.—Corpus Christi 2003, pet. filed). We set aside the verdict
only when we find that the evidence standing alone is too weak to support the finding or
that the finding is so against the overwhelming weight of the evidence that it is manifestly
unjust and clearly wrong. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996).
 
         B. Medical Malpractice
          To prevail, a plaintiff in a medical malpractice case must prove the following four
elements: (1) a duty by the physician to act according to a certain standard; (2) a breach
of the applicable standard of care; (3) injury or harm to the plaintiff; and (4) a causal
connection between the breach of the applicable standard of care and the injury or harm.
Krishnan v. Ramirez, 42 S.W.3d 205, 212 (Tex. App.–Corpus Christi 2001, pet. denied). 
The jury is usually allowed to decide the issue of causation: (1) when general experience
and common sense will enable a layman fairly to determine the causal relationship
between the event and the condition; (2) when scientific principles, usually proved by
expert testimony, establish a traceable chain of causation from the condition back to the
event; and (3) when probable causal relationship is shown by expert testimony. Duff v.
Yelin, 751 S.W.2d 175, 177 (Tex. 1988). To establish proximate cause, a plaintiff must
prove foreseeability and cause in fact. Id. at 176. Regarding cause in fact, the plaintiff
must establish a causal connection based upon “reasonable medical probability,” not mere
conjecture, speculation, or possibility. Id. 
          The rule of “reasonable medical probability” relates to the showing that must be
made to support an ultimate finding of fact and not to the standard by which the medical
expert must testify. Lenger v. Physican’s Gen. Hosp., 455 S.W.2d 703, 707 (Tex. 1970).
Expert testimony concerning the possible causes of the condition in question will often
assist the jury in evaluating other evidence in the case. Id. However, a plaintiff is not
required to establish causation in terms of medical certainty, nor is he required to exclude
every other reasonable hypothesis. Krishnan, 42 S.W.3d at 212.
C. Analysis
          Maria Morin, eighty-six years of age, was a resident of Villa Residential Care
Homes, Inc, an assisted living center. On February 26, 1998, Morin was taken to Dolly
Vinsant Hospital for an out-patient surgical procedure on her eyelid. Dr. Owens served
as the anesthesiologist for Morin’s procedure, during which an IV was run into Morin’s right
hand. Following surgery, Morin’s right hand showed signs of injury, which were ultimately
determined to be third degree burns. Morin required two surgical debridements and three
skin grafts. Morin’s suit against Dr. Owens was based on the theory that Morin’s IV fluid
had been excessively heated. 
          Yolanda Rodriguez, a Villa Residential employee, testified that Morin had no injuries
to her arm when Rodriguez accompanied Morin to the hospital two days prior to surgery. 
At this time, Morin’s hospital’s medical records show that Morin was oriented, alert, and
demonstrated her understanding of her surgical orders. 
          Consuelo Gonzales, the licensed vocational nurse at Valley Baptist Medical Center
who treated Morin during pre-operative procedures before Morin was taken in to surgery,
had no independent recollection of Morin but testified after reviewing Morin’s medical
records. Gonzales’s testimony illustrates several inconsistencies in Morin’s chart. 
Gonzales testified that Dr. Owens’ orders for the surgery specified that Morin was to
receive lactated ringers solution (a salt-based solution) in her IV. Nevertheless, Morin’s
pre-operation report showed that Morin received an IV of D5W dextrose solution (a sugar-based solution). In contrast, the post-operative report and the billing report state that
Morin received lactated ringers solution. The billing report indicates only one bag of fluid
was administered. 
          Dr. Owens’s surgical orders called for nurses to utilize a .20 jelco needle to insert
the catheter for the IV. Nevertheless, Morin’s pre-operation report showed that nurses
instead utilized a .22 jelco needle, attempting the insertion of the catheter in three separate
locations. In contrast, the anaesthesia records showed that a .20 jelco needle was used. 
           Gonzales testified that she has never used heated fluids in an IV, although she was
aware that Dolly Vinsant sometimes used heated fluids. She admitted IVs are sometimes
changed in the operating room, and if an IV is changed, then the needles used are also
changed. After Gonzales assisted Morin, Morin was taken to surgery. 
          Gonzales testified that Nurse Richardson was in charge of the notations on the pre-operation and post-operation reports. She said that Richardson was a competent nurse. 
At the time of trial, Richardson was no longer employed by Valley Baptist, as were any of
the other four employees that had actually been involved in Morin’s surgery. 
          Dr. Owens testified that he had no independent recollection of Morin’s surgery. Dr.
Owens testified: (1) that he sometimes uses heated IV fluids at the hospital; (2) when he
uses heated IV fluids, he does not note it in the patient’s chart; and (3) he often changes
IV fluids in the operating room. According to Dr. Owens, the only way to warm IV fluids
was to use the warmer in the surgical suite, and then transfer it to the ambulatory care unit,
where Morin’s surgery took place. Dr. Owens also testified that the first bag of IV fluids is
usually not heated, and that he has never used heated IV fluids in an eyelid surgery. Dr.
Owens testified that heated IV fluids are only used in surgery when there is a great blood
loss to keep the patient warm, and Morin’s eyelid surgery did not require heated IV fluids. 
Dr. Owens said it was not his “habit” to give warm fluids to a “case like this.” Similarly, Dr.
Richard B. Hecker, chief of anesthesia at Christian Santa Rosa Children’s Hospital,
testified he would never use heated IV fluids in an eyelid surgery, and that most
anesthesiologists would not use heated IV fluids in an eyelid surgery.
          Dr. Owens said that Morin went into surgery with an IV solution bag containing 500
cc of fluid. He testified that Morin’s records show that only 300 cc of fluid were used during
surgery and 200 cc of fluid were left in the bag after the surgery, therefore, Dr. Owens
concluded that only one bag of fluid was administered to Morin. In connection with this
testimony, the anesthesia record indicates that the total amount of fluid administered to
Morin was 300 cc. However, according to other evidence adduced at trial, the post
operative report shows that 300 cc remained in the bag, and further indicates that Morin
received an additional 100 cc of fluid during her stay in recovery. 
          Dr. Owens acknowledged that Morin’s hospital chart showed at least two different
types of IV solution. He further acknowledged that there were several instances in Morin’s
records indicating that Morin said the pain, redness, and swelling began after the IV, and
she never indicated that it was an external burn. 
          Dr. Owens testified that it was not possible, under any circumstances, that Morin’s
injuries were caused by the IV. Dr. Owens stated that there was “no way” an IV could
cause an injury like Morin’s. Dr. Owens did acknowledge, however, that certain IVs could
cause a progressive injury, as did defense expert Dr. Luis Rios, a hand surgeon. 
          Dr .Owens admitted that he was ultimately responsible for Morin and the condition
of her IV; however, he was not responsible if a scalding IV burned her if he was not told
about it and he did not order it. Upon cross examination, Dr. Owens conceded that his
sworn requests for admissions, in which he denied ordering the IV, were incorrect. Dr.
Owens testified that he has never witnessed medical negligence. 
          According to the medical records, following the surgery, Morin was “assisted” into 
a recliner “without difficulty.” Morin’s records stated that Morin was awake and alert when
discharged from the hospital following surgery, and no redness, swelling or edema was
noted at the IV site. 
          Following the surgery, Morin returned to Villa Residential at approximately 5:00 or
6:00 p.m. Rodriguez and another employee assisted Morin in alighting from the van and
into her bed. According to Rodriguez, Morin appeared very weak and the employees had
to carry a great deal of Morin’s weight while walking her to her room. In contrast to the
hospital’s medical records, Rodriguez testified that Morin was drowsy and appeared to still
be sedated. Rodriguez testified that Morin told Rodriguez that her arm hurt. The
employees put Morin straight to bed. That evening, Morin was atypically incontinent. The
incident report for the 26th showed that Morin was weak and required assistance, and was
observed “frequently” by employees. 
          Juanita Villarreal, the assistant executive director and licensed vocational nurse at
Villa Residential, testified that no one at Villa Residential applied any heat to Morin,
whether in the form of a heating pad or bag or other heat source, nor would staff have
applied any type of compress to Morin’s arm. Morin could not have burned herself with hot
water at Villa Residential because the water is regulated at 122 degrees. Rodriguez also
testified that there were no heating devices in Morin’s room or elsewhere at Villa
Residential that could possibly have caused the burn. Villarreal reviewed Morin’s
belongings when she was discharged from Villa Residential and she saw nothing that could
cause a burn. 
          According to Rodriguez, it was impossible for Morin to have burned herself after the
surgery because Morin was asleep from her return from the hospital until the following
morning. On February 27th, at approximately 6:00 or 6:30 a.m., attendant Gloria
Hernandez noticed that Morin, who usually came to breakfast, had not appeared for
breakfast. Hernandez went to get Morin and found her sitting up in bed. Morin again
complained of pain in her hand and arm, and Hernandez saw that Morin’s hand was red,
warm, and swollen. Hernandez administered Tylenol. Rodriguez did not complete an
incident report on the 27th regarding Morin’s complaints of pain in her arm “because
everybody hurts when they pull the IV.” That day, a nurse from Valley Baptist Medical
Center telephoned and inquired about Morin’s status. When Rodriguez told the nurse that
Morin’s arm was hurting, the nurse said, “Well I hope it wasn’t the arm where she had the
IV.”
          The following day, February 28, Morin’s hand was worse. It was swollen, red, and
purplish with a “bruised” appearance. The employees at Villa Residential took her to Dr.
Sunil John, whose records indicated that Morin was alert and oriented, and that Morin
related that she had experienced pain and swelling in her hand since the IV. John referred
Morin to an orthopedic surgeon, Dr. Herman Keillor. Dr. Keillor’s initial notes from
examining Morin show:
She allegedly had some type of eye surgery on Tuesday this past week and
said there was an IV line in her right wrist. She has had pain and swelling
since that time. Now more dramatically the hand has become severely
swollen with fluid in the dorsum of the wrist. The skin is dark. It looks much
like a burn. On the radial aspect of the wrist there is a white area that looks
deep second degree. It is almost as if this had been burned and yet no heat
had been applied. . . she is very poor historian.

Dr. Keillor testified that he attempted to get Morin to acknowledge that external heat had
been applied to her hand in some form, but Morin denied this. Dr. Keillor concluded that
Morin’s testimony was “not valid upon examining her the first day[.]” 
          Dr. Keillor hospitalized Morin and performed two surgical debridements, including
the removal of some of the veins in Morin’s arm, and three separate skin grafts to her
hand, wrist, and forearm. Morin was hospitalized from February 28, 1998 to March 23,
1998, when she was discharged to a nursing home. 
          Dr. Keillor, who served on Dolly Vinsant’s board for quality care, acknowledged that
Dolly Vinsant sometimes utilized heated IV fluids. Dr. Keillor stated that fluids could be
heated in a microwave. He testified that an internal burn would require the administration
of IV fluids heated to approximately 160 to 180 degrees. He said a person would not be
able to hold an IV bag heated to those temperatures. He further testified that a burn
caused by the administration of heated IV fluids would cause redness, swelling, and
blistering at the IV site within twenty to thirty minutes, and this did not occur in Morin’s
case. In Dr. Keillor’s opinion, Morin’s burn was caused by an external heat source,
specifically, low heat applied one to three days after her surgery, for a duration of six to
eight hours. Although Dr. Owens denied any relationship with Dr. Keillor, Dr. Keillor spoke
with Dr. Owens, whom he referred to as “a good friend,” about the case on two occasions,
and recounted socializing with Dr. Owens at his home. 
          Villarreal testified that before the surgery Morin enjoyed dancing and singing and
was very happy at Villa Residential. Domingo Perez testified that before this incident Morin
spoke, walked, and fed and groomed herself. After the burn, Perez couldn’t talk to her. 
“She complained a lot. She couldn’t – [.]” He said that after the hospitalization, Morin
started to speak a “little” better, but then was no longer able to communicate verbally.
          At trial, appellee presented the expert testimony of anesthesiologist, Dr. Richard F.
Toussiant, Jr. Dr. Toussiant testified that medical personnel use heated IV fluids when
administering large quantities of fluids and to keep certain patients, such as elderly or
pediatric patients, from becoming hypothermic. He said that medical personnel do not
always note in the hospital records when they use heated fluids. Dr. Toussiant testified:
the only way this [burn] could have happened was with the administration of
something hot. And given the distribution of the injury in the area of the IV
site, I’ve concluded that high temperature fluids were administered through
the IV [and] that the administration of excessively heated fluid through an IV
causing an injury is below the standard of care.

Dr. Toussiant also testified that the type of injury and progressive nature of the injury
indicated the use of heated IV fluids. He opined that a heating pad did not cause the burn
because: (1) the injury appeared the morning after the surgery and worsened over time,
which was consistent with an internal burn rather than a burn caused by external heat; (2)
the pattern of the injury was inconsistent with the type of burn a heating pad would have
produced; and (3) a heating pad would not be appropriate treatment for phlebitis. 
Toussiant said that within reasonable medical probability, the “only” mechanism for the
injury was the administration of heated IV fluids. Upon cross-examination, Dr. Toussiant
acknowledged that “most” people would show signs and symptoms of such a burn within
twenty to thirty minutes.
          After reviewing the evidence in a light that tends to support the jury’s finding and
disregarding all evidence and inferences to the contrary, we conclude there is more than
a scintilla of evidence to support the verdict. Stafford, 726 S.W.2d at 16. Accordingly, we
hold the evidence is legally sufficient to support the jury’s finding that Dr. Owens breached
the standard of care and that he proximately caused Morin’s burn.
          After reviewing the entire record, we also conclude that the jury’s finding is not so
contrary to the overwhelming weight and preponderance of the evidence as to be clearly
wrong and manifestly unjust. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001). 
Morin showed no sign of injury prior to surgery. Neither Dr. Owens nor any other medical
personnel recalled Morin’s surgery. Doctors and nurses acknowledged using
high-temperature IVs on occasion and such use would not be noted in a patient’s medical
records. Morin’s burns occurred on the arm with the IV in the specific area where the IV
was placed. Morin complained to Villa Residential employees that her arm hurt
immediately upon her return from surgery. The burns were first seen by the staff at Morin’s
nursing home when Morin arose from bed the morning following the surgery. The burns
appeared progressively worse over time, which is consistent with an internal burn rather
than a burn from an external heat source. The staff at the nursing home said the burn did
not and could not have occurred at the nursing home. Expert witness Dr. Toussiant
testified that, within reasonable medical probability a heated IV was the “only” way Morin’s
burns could have happened. 
          Dr. Owens contends there is no direct evidence that heated IV fluids were
administered to Morin, and the circumstantial evidence presented does not establish that
he administered any heated IV fluids to Morin.  However, the jury is allowed to consider
circumstantial evidence, weigh the credibility of the witnesses, and make reasonable
inferences from the evidence it chooses to believe. See Benoit v. Wilson, 239 S.W.2d 792,
797 (Tex. 1951). Given the numerous conflicts in Morin’s medical records and the
conflicting testimony from Dr. Owens and other witnesses, we defer to the jury’s
determination.
          Accordingly, we hold the evidence is factually sufficient to support the jury’s finding
that Dr. Owens breached the standard of care and that he proximately caused Morin’s
burn. We overrule Dr. Owens’ first issue.
II. Expert Testimony
          In his second issue, Dr. Owens complains the trial court abused its discretion by
excluding Dr. Cornwell’s testimony that the source of Morin’s burn was external. Dr.
Owens contends Dr. Cornwell’s testimony was critical and necessary for his defense. We
review a trial court's decision to strike an expert's testimony under an abuse-of-discretion
standard. Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 718 (Tex. 1998).
          After performing skin-graft surgery on Morin, Dr. Keillor sent a tissue sample to Dr.
Cornwell for pathological analysis. In a March 9, 1998, report, Dr. Cornwell made the
following diagnosis: “debridement: necrosis with acute inflammation consistent with
clinical history of third-degree burn.” 
          On May 22, 2001, Dr. Owens filed his designation of expert witnesses and included 
Dr. Cornwell as a treating pathologist. On June 18, 2001, Dr. Cornwell’s deposition was
taken.
          On June 25, 2001, immediately before jury selection, the trial court considered the
parties’ motions in limine. During the pre-trial hearing, the court asked whether anyone
wanted to strike any witnesses. Appellee’s attorney stated:
There . . . is a Doctor Margie Cornwell who is a pathologist with Valley
Baptist Medical Center. She issued a report back at the time of the incident,
and the report basically says: Third degree burns. That is an undisputed
claim in this case. . . . Since that time, in the last few months she had come
up with additional opinions of source and causation of burn, and she has
testified under oath to that. 
 
A colloquy subsequently occurred regarding whether Dr. Cornwell had been designated
as an expert witness and whether she was an expert on burns and causation. Dr. Owens’
counsel informed the court that a Daubert/Robinson


 motion had not been filed and that
such a motion was the proper vehicle to object, instead of a motion in limine. The trial
court then stated:
[t]he pathologist, if she made the findings two years ago . . . and she recalls
some things about it. . . . She is not going to be allowed to change . . . her
opinion about, or make any different finding[s] about it. If she thought it was
all right at that point in time, she should have done it . . . instead of waiting
two or three years down the road when you’re suing the doctors and the
hospital and saying, well, it is different now.
 
The court subsequently stated:
I don’t think that for purposes of voir dire, it is necessary to get into that with
the jury. . . . I will take care of it at the time of the trial itself, and I will hear
that motion outside the presence of the jury again.
 
          A jury was selected and impaneled on June 25, 2001. The next morning, appellee
filed a motion to exclude Dr. Cornwell, asserting a Daubert/Robinson challenge. In the
motion, appellee claimed that Dr. Cornwell did not meet the six Daubert/Robinson factors. 
On June 27, 2001, the trial court signed an order granting appellee’s motion to exclude Dr.
Cornwell’s testimony. In the order, the court stated it had determined Dr. Cornwell did not
meet the six Daubert/Robinson factors.
          On June 28, 2001, counsel for Dolly Vinsant Memorial Hospital (“the Hospital”)
called Dr. Cornwell as a witness. Because of the prior exclusion order, the trial court was
asked whether it wanted to hear Dr. Cornwell’s testimony outside the presence of the jury. 
The court replied:
I guess. I don’t have any problem hearing it. I think you are only going
through qualifications. . . . I think everybody will stipulate that she is a very
good pathologist. I have no problem with her pathology expertise. She has
testified in many murder cases, in my court.
 
The Hospital’s attorney then examined Dr. Cornwell outside the presence of the jury
regarding her qualifications as an expert witness. After the jury returned to the courtroom,
the Hospital’s attorney asked Dr. Cornwell about her qualifications and the diagnosis she
had made in her pathology report. At a bench conference, the Hospital’s attorney asked
the court for permission to question Dr. Cornwell regarding the cause of Morin’s burn. The
trial court denied the Hospital’s request, and Dr. Cornwell was excused.
          Later, the Hospital’s attorney made a formal bill of exception outside the presence
of the jury. See Tex. R. App. P. 33.2. Dr. Cornwell opined that the burn was caused by an
external heat source, and also testified regarding her qualifications and opinions as an
expert. 
          A ruling on a motion in limine is a tentative ruling and preserves nothing for appeal. 
See Southwest Country Enters., Inc. v. Lucky Lady Oil Co., 991 S.W.2d 490, 493 (Tex.
App.–Fort Worth 1999, pet. denied). To preserve a complaint regarding the exclusion of
evidence, the complaining party must actually offer the evidence during the trial and secure
an adverse ruling from the court. Wyler Indus. Works, Inc. v. Garcia, 999 S.W.2d 494, 511
(Tex. App.–El Paso 1999, no pet.); see also Tex. R. App. P. 33.1(a). 
          The record shows that Dr. Owens obtained a ruling on appellee’s motion in limine
prohibiting Dr. Cornwell from testifying regarding the cause of Morin’s burn. However, Dr.
Owens did not actually offer the evidence during the trial and secure an adverse ruling from
the court. Dr. Owens neither asked the trial court for permission to examine Dr. Cornwell
regarding the cause of Morin’s burn, nor did he join in the Hospital’s request to examine
Dr. Cornwell regarding the cause of Morin’s burn.
          Accordingly, we hold that Dr. Owens did not preserve this issue for our review. See
Tex. R. App. P. 33.1. Appellant’s second issue is overruled.
III. Past Medical Expenses
          In his third issue, Dr. Owens contends: (1) the evidence is legally and factually
insufficient to support the jury’s finding of past medical expenses of $141,000; (2)
alternatively, the evidence is legally and factually insufficient to support the jury’s finding
of past medical expenses in excess of $60,561.74; and (3) alternatively, the jury’s finding
of $141,000 is contrary to the stipulations of the parties.
          The jury heard the following evidence regarding Morin’s past medical expenses: (1)
testimony from Dr. Keillor; (2) billing records from Harlingen Bone & Joint Clinic totaling
$7,719.69; (3) billing records from San Juan Nursing Home totaling $91,291.31; and (4)
billing records from Valley Baptist Medical Center totaling $42,821.43.
          Dr. Owens argues that only the first three months of Morin’s stay at the San Juan
Nursing Home, totaling $10,020.63, is attributable to the treatment of her injury. Dr.
Owens’ argument is based on the following testimony from Dr. Keillor:
Q:In your chart I noticed that you wanted her having skilled nursing care
after her discharge from Valley Baptist, correct?
 
A:Yes.
 
Q:And in your chart, you say she needs two more weeks of skilled
nursing care, and this was ten weeks after the jury – I mean, this was
ten weeks post injury[,] ten weeks post discharge from Valley Baptist. 
So she had been at the San Juan Nursing Home for ten weeks and
you said she needed ten weeks and you said she needed two more
weeks of skilled nursing home. Does that make sense to you? 
 
A:If I said that it was because we were having trouble with the donor site
and I didn’t want that to get infected again.

* * * * * * *
 
Q:And for that three month period after your treatment, after she was
discharged from Valley Baptist that three month period of nursing
home care was . . . to treat her burn; correct?
 
A:Yes.
 
Q:. . . Can you tell me what the bill was, for the first three months of
nursing home care for Mrs. Morin?
 
A:$10,020.63.
 
Q: Was that reasonable and necessary for her care?
 
A:Again, I don’t know the nursing home standards. But I do know a lot
of – there is dressing changes, so, over and above the standard
nursing home care she had skilled care. And the skilled care was to
work on these wounds.
 
Q:So the degree of necessary . . . care was higher in this place than an
ordinary custodial care?
 
A:Right.

          We initially note that the record does not contain a stipulation that would affect the
amount of damages. As evidence of a stipulation, Dr. Owens refers us to a colloquy
between counsel at the bench during closing argument. However, the exchange between
counsel does not show the existence of such an agreement.


 Moreover, there is no written
documentation in the record evidencing a stipulation. See Tex. R. Civ. P. 11 (“no
agreement between attorneys or parties . . . will be enforced unless it be in writing, signed
and filed with the papers as part of the record, or unless it be made in open court and
entered of record.”).
          The billing records from San Juan Nursing Home were submitted pursuant to Texas
Civil Practice and Remedies Code section 18.001. See Tex. Civ. Prac. & Rem. Code Ann.
§ 18.001 (Vernon 1997). Section 18.001(b) touches upon three elements of proving
damages for past medical expenses: (1) the amount of the charges for medical services;
(2) the reasonableness of the charges; and (3) the necessity of the charges. See Tex. Civ.
Prac. & Rem. Code Ann. § 18.001(b) (Vernon 1997); Walker v. Ricks, 101 S.W.3d 740,
747-48 (Tex. App.–Corpus Christi 2003, no pet.); Barrajas v. VIA Metro. Transit Auth., 945
S.W.2d 207, 209 (Tex. App.–San Antonio 1997, no writ). However, evidence presented
in accordance with the statute does not conclusively establish the amount of damages nor
does it establish a causal nexus between the accident and the medical expenses. Walker,
101 S.W.3d at 748; Sloan v. Molandes, 32 S.W.3d 745, 752 (Tex. App.–Beaumont 2000,
no pet.); Beauchamp v. Hambrick, 901 S.W.2d 747, 749 (Tex. App.–Eastland 1995, no
writ); see also Barrajas, 945 S.W.2d at 208 n.1. A plaintiff may recover only for reasonable
and necessary medical expenses specifically shown to result from treatment made
necessary by the negligent acts or omissions of the defendant, where such a differentiation
is possible. See Texarkana Memorial Hosp., Inc. v. Murdock, 946 S.W.2d 836, 840 (Tex.
1997). 
          We conclude the evidence is legally and factually sufficient to support the jury’s
finding of past medical expenses. See Maritime Overseas Corp. v. Ellis, 971 S.W.3d 402,
406 (Tex. 1998). The business records affidavit for San Juan Nursing Home states that
“the service provided was necessary” and the amount charged for the service, “$91,291.31,
was “reasonable at the time and place that the service was provided.”
          We note that Dr. Owen did not file counter-affidavits disputing the reasonableness
or necessity of the expenses. See Tex. Civ. Prac. & Rem. Code Ann. § 18.001(e) (Vernon
1997) (“A party intending to controvert a claim reflected by the affidavit must file a
counteraffidavit . . . .”). In the absence of a counteraffidavit, we conclude that the business
records suffice to support a fact finding regarding the reasonableness and necessity of
Morin’s medical expenses. See Tex. Civ. Prac. & Rem. Code Ann. § 18.001(a) (Vernon
1997) (“Unless a controverting affidavit is filed . . . an affidavit is sufficient evidence to
support a finding of fact . . . .”). 
          Rather than filing a counter-affidavit, Dr. Owen relied on evidence developed
through the cross-examination of Dr. Keillor. Dr. Keillor’s testimony indicates that Morin’s
injuries required three months of skilled nursing care; however, it does not affirmatively
establish that the remainder of Morin’s period of skilled nursing care was unnecessary. To
the extent that Dr. Keillor’s testimony could be construed to limit Morin’s past medical
expenses, we note that it is the jury's role to judge the credibility of the evidence, to assign
the weight to be given to testimony, and to resolve inconsistencies within or conflicts
among the witnesses' testimony. Wilhelm, 133 S.W.3d at 732. In determining the
sufficiency of the evidence, appellate courts must accept the jury’s resolution of any
conflicts or inconsistencies in the evidence. Barrajas, 945 S.W.2d at 209. 
          In this regard, we note that Morin was eighty-six years old at the time of her injury. 
It is well settled that a tortfeasor takes a plaintiff as he finds her. Coates v. Whittington,
758 S.W.2d 749, 752 (Tex. 1988). From testimony presented at trial, Morin was happy,
mobile, and talkative prior to her injury. After her injury, Morin was hospitalized for a period
in excess of three weeks, during which she underwent two surgical debridements and a
surgical graft. The testimony regarding Morin’s physical state following the injury, although
scant, indicates a significant decline in Morin’s capacity. The jury may have inferred that
Morin required additional skilled nursing care based on her declining state. 
          Further, the jury was instructed to determine the damages that would “fairly and
reasonably compensate Maria San Juana Morin, for her injuries, if any, that resulted from
the occurrence in question.” Unless the record demonstrates otherwise, we presume that
the jury followed this instruction in answering the damages question. See, e.g., Golden
Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 771 (Tex. 2003). In our evaluation of the
evidence, we note that the jury did not uniformly find all items of expenses requested by
Morin. Accordingly, Dr. Owens’ third issue is overruled.
IV. Appointment of Ad Litem
          In his fourth issue, Dr. Owens contends the trial court abused its discretion in
appointing an ad litem to represent Morin’s interests because no conflict of interest existed
between Morin and Perez, her next friend.


 
          On May 2, 2001, after finding that an ad litem needed to be appointed to represent
Morin’s interests, the trial court signed an order appointing Ernesto Gamez, Jr. as Morin’s
ad litem. We review the appointment of an ad litem under an abuse of discretion standard. 
McAllen Med. Ctr. v. Rivera, 89 S.W.3d 90, 94 (Tex. App.–Corpus Christi 2002, no pet.). 
In reviewing a trial court’s decision under an abuse of discretion standard, we must
determine whether the trial court acted without reference to any guiding rules or principles.
Id. An abuse of discretion occurs only when the trial court reaches a decision that is so
arbitrary and unreasonable as to amount to a clear and prejudicial error of law. Id.
          When reviewing an appointment of an ad litem, the court should look to whether the
next friend bringing suit on behalf of the plaintiff has interests that may run adverse to the
plaintiff. Brownsville Valley Reg’l Med. Ctr. v. Gamez, 894 S.W.2d 753, 755 (Tex. 1995);
McGough v. First Court of Appeals, 842 S.W.2d 637, 640 (Tex. 1992); Id. at 95. A trial
court may not appoint a guardian ad litem absent a conflict of interest between the [non-compos mentis] and his next friend. Rivera, 89 S.W.3d at 94. Rule 173 of the Texas
Rules of Civil Procedure provides, in relevant part:
When a minor . . . or a non compos mentis . . . is a party to a suit . . . and is
represented by a next of friend or a guardian who appears to the court to
have an adverse interest to such [person] . . . the court shall appoint a
guardian ad litem for such a person and shall allow him a reasonable fee for
his services.
 
Tex. R. Civ. P. 173. The conflict need not be actual; potential for conflict during trial or
settlement negotiations also authorizes the appointment of a guardian ad litem. Rivera,
89 S.W.3d at 95.
          On June 5, 2001, Dr. Owens filed a written objection to the appointment of a
guardian ad litem to represent Morin’s interests. Dr. Owens asked the trial court to set a
hearing and to withdraw the appointment of a guardian ad litem. In support, Dr. Owens
attached a portion of Perez’s deposition. At the hearing, Morin’s counsel argued that a
conflict of interest existed because: (1) Perez may have a stake in any settlement because
he might be the only heir to Morin’s estate; and (2) Perez may have caused Morin’s
injuries. Dr. Owens pointed out that Morin did not have a will, Perez was not Morin’s heir,
and that Morin never alleged that Perez caused her injuries. 
          Perez’s deposition testimony showed that he is not related to Morin. Perez testified
that his parents died when he was young, and Morin raised him. Perez said he refers to
Morin as his aunt, although he is not biologically related to her. Because Perez is not
biologically related to Morin, he is not Morin’s heir.
          Perez also testified that he filed suit only because he is interested in finding out what
happened to Morin. He is not making any claims in the lawsuit on his own behalf.
          Because appellee failed to prove a conflict of interest between Perez and Morin, we
hold the trial court abused its discretion in appointing an ad litem to represent Morin’s
interests. Accordingly, we hold the trial court erred in taxing ad litem fees against Dr.
Owens. Dr. Owens’ fourth issue is sustained.
          We reform the trial court’s judgment by deleting the award of ad litem fees. As
reformed, the trial court’s judgment is affirmed.
 
                                                                           FEDERICO G. HINOJOSA
                                                                           Justice

Opinion delivered and filed this
the 3rd day of February, 2005.